**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph PACE, Anthony Besase, Christ
Savides, Donald Smith, John Cialoni,
and Robert Wilson, Defendants–Appel-
lants.**

Nos. 87–2529, 87–2547, 87–2568, 87–2587,
87–2606 and 87–2798.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1989.

Decided March 15, 1990.

Anton R. Valukas, U.S. Atty., Chicago, Ill., Thomas Knight, David J. Stetler, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Chicago, Ill., for the U.S.

Joseph N. Dinatale, Dinatale & Montemurro, River Forest, Ill., Raymond J. Reynolds, Reynolds & Associates, Lansing, Mich., for Joseph Pace.

Marvin Bloom, Chicago, Ill., for Anthony Besase.

Sam Adam, Chicago, Ill., for Donald Smith.

Christopher Gronson, Oak Park, Ill., for John Cialoni.

Terence P. Gillespie, Genson, Steinback & Gillespie, Chicago, Ill., for Robert F. Wilson.

Edward M. Genson, Genson, Steinback & Gillespie, Chicago, Ill., for Christ Savides.

Mark Martin, for defendant-appellant.

Before WOOD, Jr. and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

Joseph Pace, Anthony Besase, Christ Savides, Donald Smith, John Cialoni, and Robert Wilson appeal their convictions of various cocaine distribution offenses committed between 1981 and 1987 as part of a continuing criminal enterprise headed by Savides. The defendants raise a number of issues, most of which surround searches and seizures that occurred during the investigation of the enterprise. We affirm all the defendants' convictions, but remand Savides' case to the district court for resentencing.

## I.

## FACTS

### A. *The searches and seizures*

On the evening of March 8, 1986, several Chicago police officers arrived at Savides' condominium in Park Ridge, Illinois, to execute a search warrant authorizing them to search the condominium for evidence of gambling, including gambling records and money. Savides answered the door and allowed the officers to enter. Upon entering the condominium, the police saw Besase come out of the kitchen and Donald Greco (a co-defendant who pleaded guilty and did not appeal) come out of the condominium's bedroom area. The officers found Pace in the den; he was carrying a paper bag, which one of the officers took from him. The officers detained the four men in the living room, patted them down for weapons, and then searched the apartment.

The officers found nine one-kilogram packages of cocaine lying on a bed in the room that Greco had exited. The officers also found another kilogram package of cocaine in a kitchen drawer, and found $63,000 in United States currency in the room in which they had found Pace. Believing they had walked in on a major cocaine deal, the officers arrested Savides, Pace, Besase, and Greco, and searched them incident to the arrests. The officers discovered that the bag Pace had been carrying contained nearly $13,000 in cash. The officers also seized several items from

Besase, including car keys and receipts from hotels in Daytona, Florida, and Lafayette, Indiana, that showed he had stayed at those hotels within the preceding few days. One of the officers found and cursorily examined Besase's car in the parking garage beneath Savides' condominium building that night; the search turned up no evidence.

The next day, March 9, Chicago police officers returned to Savides' condominium complex where they found Besase's car and a car they believed Pace had driven the day before. The officers decided to seize the two cars pursuant to state and federal forfeiture statutes because they believed that Besase and Pace had used the cars to drive to the cocaine transaction at Savides' condominium. Before taking Pace's car away, an officer inventoried the property in the car pursuant to departmental procedure. During the inventory, the officer found a record book and a personal address book. The officer paged through both books; he noticed that the record book appeared to contain some type of cryptic drug records, and that the address book contained a list matching the code numbers in the record book with initials. Based on his observations and on the events of the day before, the officer concluded that the books were evidence of drug transactions, and seized the books. In the following days, officers read the books in detail.

The officers transported Besase's and Pace's cars to a nearby police station. At the station, officers inventoried the contents of Besase's vehicle and found and seized receipts that indicated that Besase had been in Georgia and Indiana a few days earlier. A few days later, on March 13, the police learned that Besase was a reputed member of a Toledo, Ohio organized crime syndicate, and that he had been in Florida, a known drug source state, shortly before his arrest. This information, along with the receipts suggesting that Besase had traveled from Florida to Chicago, led police to suspect that Besase had brought the cocaine found in Savides' apartment from Florida. Suspecting that the car might still contain drugs or money

in a secret compartment, the police brought Goldie, a trained narcotics-sniffing dog, to the car. Goldie alerted positively to the car's rear seat, where the police discovered a secret compartment that turned out to contain traces of cocaine.

Shortly after Savides' release on bail following his arrest, members of the Chicago Organized Crime Intelligence Unit (the "Intelligence Unit") determined that Savides was a likely candidate for assassination by the Chicago Organized Crime Syndicate because he had broken a syndicate rule against mixing gambling business with narcotics distribution. Because they suspected the syndicate might assasinate Savides, the Intelligence Unit officers decided to stake out Savides' residence.

About three weeks later, on April 3, 1986, surveillance officers saw a stranger, later identified as defendant Wilson, drive a Ford sedan regularly driven by Savides out of the parking garage beneath Savides' condominium building. This struck the officers as suspicious because in their three weeks of surveillance they had seen nobody but Savides drive that car, except when Savides had been a passenger (and the officers had seen that but once). Because of their suspicions, the officers decided to follow Wilson.

Wilson drove to a nearby restaurant and met another unknown man, later identified as defendant Smith. Wilson and Smith walked up and down the aisles of the parking lot and appeared to be peering into car windows. Wilson and Smith then entered the Ford and rode slowly up and down the parking lot aisles while again appearing to search the parked cars. To the officers, it appeared that Wilson and Smith were checking to see if anybody was watching them. After conducting their apparent counter-surveillance, Wilson and Smith stopped behind a car with out-of-state license plates. Smith left the car, took a suitcase from the out-of-state car's trunk, and placed it in the Ford's trunk. Smith then got into the out-of-state car and followed Wilson out of the parking lot.

Wilson and Smith drove to the condominium complex. While turning into the complex, they apparently spotted the trailing officers, sped up, and made several turns; the officers considered Wilson's and Smith's driving maneuvers to be attempts to elude them. As they neared Savides' building, Wilson and Smith split up, Wilson heading for an underground parking area and Smith heading for the parking lot. Wilson opened the electronic garage door and entered the garage; one of the officers, Michael Patton, pulled his car under the descending door to wedge it open. Patton drew his gun, approached the Ford, and announced he was a police officer. Wilson dropped the car keys to the floor, kicked them under the car, and told Patton, "This isn't my car." When Patton asked whose car it was, Wilson replied, "I wasn't driving that car."

Another officer, Nick Nesis, who had followed and apprehended Smith, entered the garage with Smith. Based on what they had been told by the Intelligence Unit and on the suspicious activities of that day, Patton and Nesis believed that Wilson and Smith were hit men and that the suitcase possibly contained guns or explosives that could pose an immediate risk to the public. Nesis therefore recovered the keys, opened the Ford's trunk, and carefully opened the suitcase. Nesis found no explosives or weapons in the suitcase; he did, however, find ten kilograms of cocaine. Patton and Nesis arrested Wilson and Smith and took them to police headquarters.

After Wilson's and Smith's arrests, the police continued their surveillance of Savides. As a result of that surveillance, an Assistant United States Attorney (AUSA) presented to Magistrate Weisberg an affidavit to support a warrant to search Room 102 of a building at 1400 Renaissance Drive in Park Ridge. The affidavit, prepared by a DEA agent, included information about Savides' prior cocaine dealing, including his use of an office at 1400 Renaissance Drive. It also detailed the police's surveillance of Savides since March 8, 1986. The surveillance revealed an almost daily routine: Savides would drive circuitously to the Renaissance Drive office building, go into Room 102 (an office for which there was no

phone number and which the building's directory showed no business or connection to Savides) for a brief period, leave the office, make calls on a pay phone, and meet people (some of whom were known cocaine dealers) at restaurants, bars, and parking lots.

Magistrate Weisberg studied the affidavit, conferred with his law clerk and the AUSA for an extended period, and finally informed the AUSA that he believed the affidavit did not establish probable cause to search the office. Shortly after Magistrate Weisberg ruled, the AUSA presented the affidavit to Chief Magistrate Balog. The AUSA told Chief Magistrate Balog that Magistrate Weisberg said he did not object to another magistrate reviewing the affidavit. The chief magistrate reviewed the affidavit, and issued a warrant to search Room 102. The search uncovered 200 grams of cocaine and assorted cocaine paraphernalia. DEA agents also found Savides' fingerprints in 18 locations in the office.

### B. *Statements by John Cialoni*

Defendant John Cialoni was a bit player in Savides' cocaine distribution enterprise during the early 1980's. In early May 1986, the DEA learned that Cialoni was facing state criminal charges and was looking to barter information in hopes of obtaining leniency in his state case. On May 12, Cialoni met with two DEA agents. Cialoni told the agents what he wanted in exchange for information. The agents rejected Cialoni's demands and told him that if he offered truthful and accurate information that would lead to detailed leads, they would make the state prosecutor aware of his cooperation. The meeting then ended.

The agents again met with Cialoni on May 22. The agents rejected another series of demands by Cialoni and read him his *Miranda* rights. Cialoni then admitted his long-time involvement with Savides in various gambling and cocaine distribution operations. As the meeting ended, Cialoni agreed to keep in contact with the agents and provide more detailed information. Cialoni, however, did not provide any further information. As a consequence, the agents did not contact the state prosecutor about Cialoni's pending case.

### C. *District Court Proceedings*

A grand jury returned a multi-count indictment against Pace, Besase, Savides, Smith, Cialoni, and Wilson, alleging various narcotic distribution offenses. The indictment also charged Savides with conducting a continuing criminal enterprise (CCE), 21 U.S.C. § 848. Before trial, the defendants moved to suppress evidence found in the various searches. For the most part, the district court denied these motions, issuing a series of published opinions. See 658 F.Supp. 1399; 661 F.Supp. 1024; 664 F.Supp. 1544; 664 F.Supp. 1555; and 665 F.Supp. 686. The district court also denied Cialoni's motion to sever his trial. See 661 F.Supp. at 1028–29.

Besase and Pace pleaded guilty on the condition that they be allowed to appeal the denials of their motions to suppress. See Fed.R.Crim.P. 11(a)(2). Savides, Cialoni, Wilson, and Smith proceeded to trial, where a jury found them guilty of all counts charged. In addition, the jury returned a special forfeiture verdict against Savides.

## II.

## ANALYSIS

### A. *Savides, Wilson, and Smith*

1. Savides' motion for an evidentiary hearing pursuant to *Franks v. Delaware.*

The Chicago police obtained a warrant to search Savides' condominium based on the affidavit of Officer Harry McKenna. That affidavit essentially stated that McKenna and his partner were sitting in an undisclosed place when they witnessed a man walk up to a pay telephone, pull out a betting form, dial a phone number and begin to place wagers on basketball games. The police officers then approached the man, who is not named in the affidavit, identified themselves and asked the man what transpired on the phone. The unidentified man told the officers he had placed a bet with his

bookmaker. The police officers asked the man if he would call again and place another wager. The man, after receiving assurance he would not be arrested if he cooperated, agreed to allow the officers to observe him dial two different numbers, identify himself, and place wagers. One of the two phone numbers the man dialed was subsequently traced through phone company records to Christ Savides at his Park Ridge apartment.

658 F.Supp. at 1403. Savides contends that McKenna falsified information in the affidavit; specifically, Savides contends that the informant (the hapless phone caller) mentioned in the affidavit never existed. Savides moved the district court to hold an evidentiary hearing to determine if McKenna intentionally or recklessly submitted false information in the affidavit. The district court denied Savides' motion.

■ In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that intentionally or recklessly submitting false statements in a warrant affidavit violates the Fourth Amendment. *Id.* at 164–65, 98 S.Ct. at 2680–81. The Court further held that in certain limited situations, a defendant may obtain a hearing to present evidence to challenge the warrant affidavit's truth. To obtain an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affiant has intentionally or recklessly included a false statement in the warrant affidavit, and that the false statement is material, in the sense that it is necessary to find probable cause. *Id.* at 155–56, 171–72, 98 S.Ct. at 2676–77, 2684–85.

In this case, Savides submitted several items in his attempt to make the substantial preliminary showing that *Franks* re-

quires. Included among those were twenty-nine affidavits from Chicago vice officers that were similar to the affidavit that McKenna filed to obtain the warrant in this case. McKenna or his partner, Officer John Noonan, had filed a number of these affidavits. Savides also submitted court records of state court cases in which similar warrants had been held invalid for vagueness. Savides also submitted an affidavit from his brother, Dino, concerning his arrest for gambling activities, and his own affidavit stating that he never accepted any bets over the phone number that McKenna purportedly saw the informant dialing, that that number was not registered to his condominium, and that his phone number was unlisted. After reviewing these materials and hearing oral argument, the district court denied Savides' motion for a *Franks* hearing. See 658 F.Supp. at 1403.

■ Savides contends that he made the necessary showing under *Franks* and that the district court should have held an evidentiary hearing. The first issue we face is the proper standard for reviewing the district court's decision. Savides insists that de novo review is appropriate; the government counters that we should review the district court's decision for clear error.

This circuit has not decided the proper standard for reviewing a district court's decision to deny a *Franks* hearing.[1] The Ninth Circuit has held, in numerous cases, that de novo review is the proper standard. E.g., *United States v. Whitworth*, 856 F.2d 1268, 1280 (9th Cir.1988); *United States v. Johns*, 851 F.2d 1131, 1133 (9th Cir.1988); *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir.1986). The First Circuit, on the other hand, has broadly indicated that a more deferential standard is appropriate. See *United States v. Mastroianni*, 749 F.2d 900, 909, 910 (1st Cir.1984); *United States v. Rumney*, 867 F.2d 714, 720 (1st Cir.1989); *United States v. Southard*, 700 F.2d 1, 10–11 (1st Cir.1983). We conclude

1. The government cites *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984), as directly standing for the proposition that the clearly erroneous standard is the proper standard for reviewing a district court's decision to deny a *Franks* hearing. It does not stand for that proposition; instead, *Williams* held only that the clearly erroneous standard applies to a district court's ultimate factual finding, made *after* a *Franks* hearing, that the warrant affiant did not intentionally or recklessly make a false statement in his affidavit. We trust that the government was not trying to mislead this court by its citation to *Williams* but instead just misread the case.

that the more deferential clearly erroneous standard is proper.

■ Savides contends that since the district court's decision involved no credibility determinations, this court is in just as good a position as the district court to decide the issue, so that de novo review rather than more deferential review is appropriate. But deferential review does not depend merely on the district court's ability to view witnesses and judge their credibility. Determining the proper standard of appellate review also requires us to examine the different roles of the district and appellate courts, and the efficient use of judicial resources, which includes the rational division of labor between the district and appellate courts. See *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933–34 (7th Cir.1989).

■ There are several reasons that lead us to conclude that it would make little sense for this court to redo the district court's work in deciding whether to hold a *Franks* hearing. First, in determining whether to hold a *Franks* hearing, the district court's task involved sorting through the materials Savides submitted, weighing the possible inferences those materials raised, and determining the likelihood that Noonan lied in his warrant affidavit. This task involved essentially the same process as fact-finding. It is the type of task that district courts do every day. With this repetition comes expertise, an expertise the courts of appeals do not have. Cf. *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Thus, it is unlikely that de novo review will lead to more "correct" decisions over the run of cases. Second, while Fourth Amendment rights are valuable, a search's illegality does not make the evidence gathered in that search any less probative or reliable. Cf. *Stone v. Powell*, 428 U.S. 465, 489–91, 96 S.Ct. 3037, 3050–51, 49 L.Ed.2d 1067 (1976); *People v. Lucente*, 116 Ill.2d 133, 107 Ill.Dec. 214, 220, 506 N.E.2d 1269, 1275 (1987). Thus, even if de novo review is more likely to catch and correct more "mistakes" by the district courts in denying *Franks* hearings, those

mistakes do not go to a defendant's actual guilt or innocence. Third, "the adequacy of a [*Franks*] proffer may depend on the circumstances of each case." *Lucente*, 107 Ill.Dec. at 222, 506 N.E.2d at 1277. Such case-specific determinations are unlikely to produce precedents to guide future cases. See *Mars Steel*, 880 F.2d at 934. In such case-specific determinations, where more deferential review is not likely to lead to a significantly greater number of "correct" decisions in the long run, and where mistakes do not go to guilt or innocence, de novo review imposes too great a cost for the benefits it might obtain.

■ Review for clear error does not mean no review. Where this court reaches a "firm and definite conviction" that the district court has erred, we will reverse that court's decision. See *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511. But where the district court has reasonably and conscientiously reviewed the defendant's *Franks* proffer, and has properly applied the law, its decision should stand even if we, as an original matter, would have ordered the hearing. Cf. *Lucente*, 107 Ill. Dec. at 222, 506 N.E.2d at 1277 (district court's decision whether or not to hold a *Franks* hearing is "to a degree ... final"; appellate court should not disturb the district court's decision if that court has exercised its judgment "within permissible limits").

■ On the record before us, we conclude that the district court did not clearly err in refusing to hold a *Franks* hearing. While the affidavits' similarity could raise an inference of falsity, it could also be "merely indicative of a standard investigative approach," 658 F.Supp. at 1403, and an example of police officers using language that courts had approved in earlier warrant applications. There were also significant differences in many of the affidavits, which could help dispel fears of fabrication. Savides' self-serving statement in his affidavit that he never accepted bets on the number listed in the warrant affidavit is not sufficient to require a *Franks* hearing, see *United States v. McDonald*, 723 F.2d 1288, 1294 (7th Cir.1983), and the fact that his

number was unlisted ignores that police have access to phone numbers that private citizens do not. Furthermore, that other warrants based on similar affidavits were held invalid for vagueness has nothing to do with whether the facts stated in Noonan's affidavit were false.

■ Savides contends that an evidentiary hearing was necessary so he could question Noonan. Savides told the district court that he would only ask Noonan to name his informant. 1 Tr. at 16. Savides could not tell the court what Noonan's answer would be; he could only speculate that Noonan would say either that he never took the name or that he had lost the name. Savides' request to question Noonan was nothing more than "a mere desire to cross-examine," an insufficient reason to hold a *Franks* hearing. See *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. It was thus not clear error to deny Savides a hearing to introduce that testimony.

2. April 3, 1986 search of the suitcase.

Savides, Wilson, and Smith contend that the district court should have suppressed the cocaine police found when searching the suitcase in the trunk of the car Wilson was driving. According to the defendants, the police had no basis for detaining Wilson and Smith, and had neither probable cause nor a warrant to search the suitcase. The district court held that the police were justified in stopping Wilson and Smith and that probable cause existed to believe that the suitcase contained potentially dangerous objects (guns or explosives), so that it was reasonable to search the suitcase without a warrant. We agree.

■ Officers Patton and Nesis, the officers who stopped Wilson and Smith and found the cocaine in the suitcase, had been staking out Savides' condominium for three weeks. They knew that their surveillance efforts were extraordinary, and they knew the reason for this special commitment of resources: experienced members of the Chicago Intelligence Unit had determined that Savides was a likely assassination target because he had broken crime syndicate rules by mixing gambling and cocaine distribution. When they saw somebody other than Savides driving Savides' car, without Savides in the car (an event they had never before seen), the officers became justifiably suspicious. The officers then followed Wilson to a restaurant, where he met Smith, and where Wilson and Smith made what appeared to be efforts to make sure they were not being watched. The officers saw Smith transfer a suitcase from his car to Wilson's and saw the two drive off together to Savides' condominium complex. Upon realizing they were being followed, Wilson and Smith sped up and appeared to try to elude the officers.

Based on these findings, which were not clearly erroneous, we agree with the district court that "Patton and Nesis possessed at least a reasonable suspicion that Wilson and Smith might be assassins on their way to make an attempt on Savides' life." 665 F.Supp. at 690. Because of this reasonable suspicion, Patton and Nesis were entitled to stop and briefly detain Wilson and Smith to investigate and resolve their suspicions. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also *Michigan v. Long*, 463 U.S. 1032, 1045–52, 103 S.Ct. 3469, 3479–82, 77 L.Ed.2d 1201 (1983).

■ The defendants contend that Patton's warrantless entry into the garage to detain Wilson violated the Fourth Amendment because the garage was part of the "curtilage" to Wilson's home. (Wilson lived in the condominium complex.) Generally, police may not enter a person's home to arrest that person without a warrant. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A home's "curtilage" is the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home. See *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987).

■ Assuming without deciding that the garage was part of the curtilage

of Wilson's condominium,[2] we conclude that Patton did not violate the Fourth Amendment by entering the garage to detain Wilson. *Payton* is distinguishable; it involved a "routine" arrest in a person's home, and the Court specifically declined to decide any issues other than the one before it. See 445 U.S. at 582–83, 100 S.Ct. at 1377–78. In this case, Patton was pursuing a man whom he reasonably suspected might be an assassin on his way to do his work, and who took what Patton considered to be evasive action upon discovering he was being followed. When Wilson entered the garage, Patton had to decide whether to pursue Wilson to investigate his suspicion or whether to let Wilson go despite the threat he might have posed to Savides. If Patton had decided to let Wilson go, and if his suspicion had been correct, the consequences could have been drastic. *Terry*'s touchstone is the Fourth Amendment's general reasonableness requirement. See 392 U.S. at 21–22, 88 S.Ct. at 1879–80. Balancing the need for Patton's action (to investigate a possible threat to Savides' life) against the intrusion on Wilson's privacy (a brief detention, in a garage, to allay his suspicions), along with the circumstances surrounding that intrusion, see *id.* at 21, 88 S.Ct. at 1879; *Long,* 463 U.S. at 1046, 103 S.Ct. at 3479, we conclude that Patton's entry into the garage was reasonable and thus did not violate the Fourth Amendment.

When Patton approached Wilson (with gun drawn, which in itself was not unreasonable given what Patton suspected Wilson was up to), Wilson responded by throwing the car keys under the car and denying that he had any interest in the car or that he had ever even driven the car. This behavior was bizarre: in common parlance, Wilson behaved like a child "caught with his hands in the cookie jar." This bizarre behavior was sufficient to elevate Patton's and Nesis's suspicion to a reasonable belief—that is, probable cause—that Wilson and Smith were the hit men they had been looking for.

▪ That leaves the question of whether Patton and Nesis were justified in removing the suitcase from the trunk and searching the suitcase without a warrant. Patton and Nesis had seen Smith and Wilson put the suitcase in the trunk. Given that Patton and Nesis had probable cause to believe that Wilson and Smith were hit men, it was reasonable for them to believe that Wilson and Smith were carrying the tools of their trade. It was also reasonable to conclude, given their observation of Wilson's and Smith's activities at the time they transferred the suitcase to the trunk, that those tools would be in that suitcase. Common sense—something we do not have to ignore in determining whether probable cause exists in a particular case—strongly suggests that those tools could include explosives. Cf. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Placing explosives in victims' cars is certainly not an uncommon way for assassins to kill people. We agree with the district court that the situation justified entering the trunk and opening the suitcase without a warrant under the exigent circumstances exception to the warrant requirement. Compare *United States v. Moschetta,* 646 F.2d 955, 959 (5th Cir.1981) (upholding a warrantless search under similar facts, and stating that "In light of the [officers'] belief, it would be foolhardy ... to delay a search of such containers.") Since the cocaine was in plain view when Nesis opened the suitcase, he was entitled to seize it. See *United States v. Edwards,* 885 F.2d 377, 389 (7th Cir.1989). Thus, the district court did not err by denying Sa-

---

2. Whether a particular area is part of a home's curtilage depends on several factors: the proximity of the area to the home itself, the nature of the uses to which the home is put, whether the area is within an enclosure surrounding the home, and the steps the resident has taken to protect the area from observation by passersby. See *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139. Savides, Wilson, and Smith have provided no

detail concerning the garage and the application to it of the four factors cited in *Dunn,* so it is not possible to decide for certain whether the garage in this case was curtilage. As the government described the garage at oral argument, it appears that the garage was a large common area underneath the condominium building in which each condominium resident was provided a space to park his car.

vides', Wilson's, and Smith's motions to suppress the cocaine found in the suitcase.[3]

3. The January 3, 1987 search of Savides' office.

 Savides contends that the district court erred by denying his motion to suppress the cocaine and other evidence found when DEA agents searched his Park Ridge office on January 8, 1987. Savides first contends that the court should have suppressed the evidence from the search because it was improper for the government to submit DEA Agent Morley's warrant affidavit to Chief Magistrate Balog after Magistrate Weisberg had denied the government's application for a warrant based on the same affidavit. Savides claims that Magistrate Weisberg's determination that the affidavit failed to demonstrate probable cause was final and binding and estopped the government from resubmitting the same affidavit, without more, to another magistrate.

The Fourth Amendment commands that searches not be "unreasonable," and that "no warrants shall issue, but upon probable cause...." Years ago, Justice Jackson set forth the basic policy behind the warrant requirement:

> The point of the Fourth Amendment ... is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1946).

Savides does not contend that Chief Magistrate Balog had an interest in this case or was biased towards the government, or was otherwise not the "neutral and detached magistrate" that the Fourth Amendment demands. Cf. *Coolidge v. New Hampshire*, 403 U.S. 443, 449–53, 91 S.Ct. 2022, 2029–31, 29 L.Ed.2d 564 (1971) (warrant issued by state attorney general, who was acting as justice of the peace and empowered to issue warrants under state law, was invalid because not issued by a "neutral and detached magistrate"). Nor does Savides assert that DEA Agent Morley falsified information in the warrant, the evil the Court faced in *Franks v. Delaware*. Savides does assert that Morley's affidavit did not show that probable cause existed, and that the government deliberately withheld material information from Chief Magistrate Balog (another evil prohibited by *Franks*, as we shall see). But these are separate issues from Savides' estoppel argument, and for purposes of analyzing that argument we can assume that Chief Magistrate Balog's finding of probable cause was correct, and that the government did not withhold material information.

Savides, in essence, is asking us to suppress evidence from a search conducted pursuant to a warrant issued by a "detached and neutral magistrate" who properly (we presume) found that probable cause existed to search, simply because another magistrate had refused to issue a warrant based on the same showing by the government. But, assuming that probable cause actually existed and the government withheld no material information, the government did all the Fourth Amendment required. Agent Morley did not depend on his own discretion in deciding to search, see *Johnson*, 333 U.S. at 14, 68 S.Ct. at 369; instead, he sought, and received, approval from a judicial officer.

The Fourth Amendment on its face does not prohibit the government from seeking a second magistrate's approval to search when another magistrate denies a search warrant. The Fourth Amendment commands only that a "neutral and detached magistrate" determine that probable cause exists. Thus, the important questions, from a Fourth Amendment standpoint, are

---

**3.** We need not pass on the district court's holding that Wilson lacked standing to challenge the search. See 665 F.Supp. at 689–90.

whether the magistrate really was "neutral and detached," and whether probable cause actually existed, not how many magistrates the government applied to before finally obtaining a warrant. *Franks v. Delaware* supports this approach. In *Franks*, the Court held that even where a defendant makes a substantial showing that the government recklessly or deliberately lied to the magistrate, no hearing is required if the other material in the warrant affidavit suffices to show probable cause. *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. Submitting false material to the magistrate subverts the Fourth Amendment's warrant requirement because deliberately falsified information could mislead a magistrate into finding probable cause and issuing a warrant where he might otherwise not do so. See *id.* at 167–68, 98 S.Ct. at 2682–83. Yet, the Court is willing to let a warrant stand if absent the false information probable cause still exists, even though the magistrate himself might have thought the facts important in finding probable cause. There is even less reason to suppress evidence from a search pursuant to a warrant issued by a magistrate who properly found probable cause based strictly on facts that the warrant affiant honestly and reasonably believed.

This approach in no way lessens the Fourth Amendment's protections: if the second magistrate's decision to issue the warrant was incorrect, a reviewing court can eventually suppress the evidence. See 2 Wayne R. LaFave, *Search and Seizure*, § 4.2(e), at 164–65 (1987). Savides contends that allowing the government to resubmit a rejected warrant application to a second magistrate will lead to "magistrate shopping," thus depreciating the magistrate's role and diminishing the warrant requirement to a mere rubber-stamping process. As a practical matter, the kind of "magistrate shopping" Savides envisions probably does not create a great problem. The parties have been able to uncover only one reported opinion (and we have found no other) besides the district court's opinion in this case that has even addressed the issue of resubmitting a warrant application to a second magistrate. See *United States v.*

*Davis*, 346 F.Supp. 435, 442 (S.D.Ill.1972). Moreover, the defendant can still assert that probable cause did not exist to issue the warrant (a challenge Savides has made here), or that the applying officer knew that the second magistrate was not the "detached, neutral magistrate" the Fourth Amendment requires. See generally La-Fave, *supra*, § 4.2. A blanket rule barring the government from resubmitting a warrant application to a second magistrate would do little, if anything, to protect Fourth Amendment values. Such a rule would, however, cause courts to suppress evidence found in searches pursuant to warrants issued on probable cause. The district court correctly rejected such an approach.

 Savides contends that even if it was proper to submit the warrant application to Chief Magistrate Balog, the district court should have suppressed the evidence found in the search because Agent Morley's affidavit did not support a finding that probable cause existed to search his apartment. The district court rejected this contention; so do we.

Agent Morley's affidavit contained information concerning Savides' past cocaine dealing, including the circumstances surrounding his arrest on March 8, 1986, the results of the search of the car Wilson was driving on April 3, 1986 (which turned up ten kilograms of cocaine), and Savides' contacts with other known cocaine dealers, including Wilson, Pace, and Besase. The affidavit also revealed that Savides had used a "stash pad" to store cocaine. According to the affidavit, a former customer of Savides told the DEA that before Savides' March arrest, he would often pick up cocaine from Savides in restaurants and parking lots near 1400 Renaissance Drive in Park Ridge. That customer also told the DEA that Savides kept a stash of cocaine in a location that only Savides knew.

The affidavit also contained information about the surveillance conducted on Savides after his March 8, 1986 arrest. Savides had an almost daily ritual. He would drive evasively to an office building at 1400 Renaissance Drive, and enter Room 102 of

the office building for a brief period. Savides would frequently use a pay phone outside the building shortly before entering or after leaving. Telephone company records revealed no phone number listed for Room 102, and the building's office directory listed no business in Room 102 or any connection between Savides and the room. Moreover, the surveillance revealed no indication that Savides had any lawful employment.

According to the affidavit, after leaving the building Savides would routinely make frequent, short stops at various restaurants, bars, motels, business buildings, and currency exchanges. Savides would usually stay at these places just long enough to meet with people, some of whom were known or suspected cocaine dealers, in the parking lots. The affidavit ended by revealing that between January 2 and January 7, 1987, Savides continued to follow his usual routine; the affidavit then detailed Savides' activities on January 7.

Savides contends that there are three reasons why Agent Morley's affidavit does not show probable cause to search on January 8. First, Savides contends that much of the information (including the information about Savides' past cocaine dealing) was stale. Second, Savides contends that the affidavit improperly tries to paint probable cause by Savides' association with other cocaine dealers. Finally, Savides contends that most of Savides' observed activities were, by themselves, innocent; therefore, according to Savides, the surveillance did not establish probable cause.

The problem with Savides' argument is that it takes different components of the probable cause showing and views them in isolation. Determining whether or not probable cause exists involves "a practical, common-sense decision whether, given all the circumstances set forth ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). It is improper to focus on isolated aspects of a probable cause showing, artificially separating those aspects from other

facts presented to the magistrate. Cf. *id.*, 462 U.S. at 234–35, 103 S.Ct. at 2330–31. As in many evidentiary questions, the whole of a probable cause showing often is greater than the sum of its parts. Even seemingly innocent behavior might arouse suspicion in light of other circumstances. See *id.* at 243–44 n. 18, 103 S.Ct. at 2334–35 n. 18.

Viewed as a whole, Morley's affidavit is sufficient to support the magistrate's probable cause finding. The information about Savides' past cocaine dealing established his connection to cocaine dealing and to certain other dealers, and his method of operating, including his use of a "stash pad." The information from his former customer established a connection between that cocaine dealing and the area near 1400 Renaissance Drive. The surveillance, including his contacts with cocaine dealers he had dealt with in the past, and his suspicious use of Room 102, raised the reasonable inference that Savides' cocaine dealing continued, and that Room 102 probably was the "stash pad" referred to by other informants. From all this information, Chief Magistrate Balog could reasonably make the "practical, common-sense determination" that "a fair probability" of finding cocaine in Room 102 existed.

■■■ Savides finally contends that the district court should have suppressed the evidence found in the January 8 search because the government deliberately or recklessly withheld material information from Chief Magistrate Balog. The rule of *Franks v. Delaware*, prohibiting a police officer from deliberately or recklessly presenting false material information in a warrant application, also prohibits the officer from deliberately or recklessly omitting material information from the application. *United States v. Williams*, 737 F.2d 594, 604 (7th Cir.1984). Thus, if Savides showed that Agent Morley and the AUSA deliberately or recklessly failed to disclose facts to Magistrate Balog, and if those facts are material—in the sense that "if the fact were included, the affidavit would not support a finding of probable cause," *id.* —he would, under *Franks*, be entitled to

suppression of the evidence found in the January 8 search.

■ According to Savides, there were three material omissions. First, Savides asserts that the government did not tell the Chief Magistrate that Magistrate Weisberg earlier had denied the same warrant application. But as our earlier discussion shows, the important questions for Fourth Amendment purposes are whether the warrant application shows probable cause and whether the issuing magistrate is truly "detached and neutral," not whether another magistrate had found the same showing deficient. We thus do not think that the fact that Magistrate Weisberg had denied a warrant on the same showing is material in the sense *Franks* requires; even had it included this fact, Morley's affidavit would still have been sufficient to show probable cause.[4]

■ Savides also contends that while the affidavit alleged that on January 7 he entered a friend's home with a suspicious-looking white bag (attempting to raise the inference that the bag contained cocaine), the affidavit did not disclose that a subsequent search of that home uncovered only plastic bags that contained suspected cocaine residue. We fail to see how this alleged omission was material; if anything, the fact that the search turned up plastic bags containing possible cocaine residue would seem to strengthen, rather than weaken, any inference that Savides delivered cocaine to the home. In any event, even if this information was material, it could not have been a deliberate or reckless omission because the search Savides refers to occurred on January 9, two days *after* Agent Morley and the AUSA submitted the warrant application.

■ Savides finally contends that Agent Morley's affidavit failed to disclose that police had detained and searched him on January 7 and found no cocaine. However, Savides submitted nothing in the district court other than his bald assertion to show that Agent Morley knew about the January 7 search. Moreover, we agree with the district court that this information was not material. Even if the affidavit had included information about the January 7 search, the affidavit still would have been sufficient to support a probable cause finding.

Since it did not violate the Fourth Amendment to submit the warrant affidavit to the second magistrate, and since Agent Morley's affidavit was sufficient to show probable cause and deliberately or recklessly omitted no material facts, the district court did not err in not suppressing the evidence found in the January 8 search.

4. Sufficiency of the evidence to convict on Counts Two, Three, Four, and Six.

■ Count Two of the indictment charged Savides with delivering approximately two kilograms of cocaine in August 1982. Count Three charged Savides with delivering approximately one kilogram of cocaine "on or about" December 7, 1985. Count Four charged Savides with delivering approximately one kilogram of cocaine "on or about" December 14, 1985.

The government's proof on Count Two rested primarily on the testimony of Paul Meeghan, the man to whom Savides made the delivery alleged in Count Two. Similarly, the government's proof on Counts Three and Four rested primarily on the testimony of Barry Litberg, the man to whom Savides

---

4. Even if Magistrate Weisberg's prior decision not to issue the warrant was material, we would reject Savides' argument on this point. The district court found that the AUSA had told Chief Magistrate Balog "that Magistrate Weisberg [had] failed to find probable cause on the same application." 658 F.Supp. at 1405. This finding, based upon the district court's review of the AUSA's and the two magistrates' stipulated testimony, is not clearly erroneous. The AUSA stated that he told Chief Magistrate Balog that Magistrate Weisberg had failed to find probable

cause on the same application. Savides points out certain inconsistencies in the AUSA's testimony and between the AUSA's testimony and the magistrates'. But sorting out discrepancies in testimony is for the fact finder. Although the district court could have reached a different conclusion, none of the "inconsistencies" that Savides points out leave us "with a definite and firm conviction" that the district court made a mistake in accepting the AUSA's testimony. *Anderson v. Bessemer City*, 470 U.S. at 573, 105 S.Ct. at 1511.

made the deliveries in those counts. Savides argues that both Meeghan and Litberg were cocaine dealers and users, that both witnesses' testimony was impeached, that both had been convicted and therefore had a motive to lie (the motive being possible leniency in sentencing), and that both witnesses' testimony was uncorroborated. Therefore, says Savides, Meeghan's and Litberg's testimony was inherently unbelievable and does not support guilt beyond a reasonable doubt.

The argument based on "inherent unbelievability" need not detain us long. We have reviewed the testimony, and nothing in that testimony is inherently unbelievable—there is nothing in the testimony that contradicts the laws of nature or other indubitably true evidence. See *United States v. Dunigan*, 884 F.2d 1010, 1013–14 (7th Cir.1989). Meeghan and Litberg might not have been the most reliable witnesses, but credibility determinations are for the jury. Savides had the opportunity to make the same arguments to the jury that he makes to us. The jury chose to believe Meeghan and Litberg; that was the jury's right.

Regarding Count Two, the delivery to Meeghan, Savides makes two more specific arguments. First, he notes that Cialoni made the physical delivery and that there was no evidence to link Savides to that delivery. However, Meeghan testified at length about his past cocaine dealings with Cialoni and Savides, the relationship between Cialoni and Savides, and the circumstances surrounding the charged delivery. The jury could reasonably infer from this testimony that Savides was involved in the delivery charged in Count Two.

■ Second, Savides argues that the government failed to present expert testimony that the substance delivered to Meeghan contained cocaine. But the government does not have to present expert testimony; circumstantial evidence will suffice. See *United States v. Murray*, 753 F.2d 612, 615 (7th Cir.1985). In his reply brief, Savides expands on his argument, claiming that the government produced no evidence that the substance delivered to Meeghan

(and, for that matter, to Litberg) contained cocaine. The first problem with this broader argument is that it comes too late: a reply brief is not the proper place to introduce new arguments. See *Ippolito v. WNS, Inc.*, 864 F.2d 440, 455 n. 12 (7th Cir.1988). At all events, both Meeghan and Litberg were familiar with cocaine (both as users and dealers), and had extensive cocaine dealings with Savides. The jury could reasonably infer from this, and from the price charged for the substances Meeghan and Litberg received, that those substances included cocaine. Cf. *Murray*, 753 F.2d at 615; *United States v. Blanton*, 884 F.2d 973, 977 (7th Cir.1989).

■ Savides also challenges the sufficiency of the evidence to convict him on Count Six. Count Six charged Savides with possessing the ten kilograms of cocaine found when Chicago police stopped Wilson and Smith on April 3, 1986 and searched the suitcase found in the car Wilson was driving. Since Savides did not actually possess the cocaine in the suitcase, the jury could find him guilty only if it could conclude that he constructively possessed it or aided and abetted Wilson's and Smith's possession. See 18 U.S.C. § 2. " 'To establish constructive possession, the government must produce evidence demonstrating ownership, dominion, or control over the contraband.' " *United States v. Moya–Gomez*, 860 F.2d 706, 756 (7th Cir. 1988). To establish that a person aided and abetted a crime, the government must show that the person " 'encouraged or assisted another in committing the offense, and . . . had the intent to aid its commission.' " *Id.* Viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found Savides guilty of constructive possession or aiding and abetting.

The evidence established that the car Wilson used to transport the cocaine was owned by a car dealership that Savides controlled. In three weeks of surveillance, the police had seen somebody other than Savides drive the car only once; and, that time, Savides had ridden in the car as a passenger. Thus, the jury could have rea-

sonably concluded that Savides controlled who did and did not use the car, and that Wilson was driving the car with Savides' permission. Wilson was a long-time employee of Savides' cocaine distributing enterprise. Phone records showed that Savides had called both Wilson and Smith within weeks before the April 3 incident. The jury could have concluded that Savides loaned his car to Wilson to pick up the cocaine Smith was bringing in from Florida. From all this evidence, a reasonable jury could have concluded that Wilson was acting as Savides' agent. Therefore, the jury could reasonably conclude that Savides constructively possessed the cocaine in the suitcase or that he was aiding and abetting Wilson's and Smith's possession.

5. Sufficiency of the evidence to support forfeiture.

The jury found that $63,500 found on a shelf in Savides' den on March 8, 1986, and a Mercedes Benz that Savides had driven on January 7, 1987, were subject to forfeiture pursuant to 21 U.S.C. § 853. Savides contends that the evidence did not support the forfeiture verdict.

■■■ Savides was convicted of conducting a continuing criminal enterprise (CCE) under 21 U.S.C. § 848, and thus was subject to criminal forfeiture proceedings under § 853. See 21 U.S.C. § 848(a). Section 853 provides, in part, that the following property is subject to forfeiture:

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [violating the CCE provision]; [and,]

(2) any ... property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation....

The court's instructions and the special verdict forms instructed the jurors that to find the money subject to forfeiture, they had to find beyond a reasonable doubt that the money was "acquired or obtained with [Savides'] profits from the continuing criminal enterprise, or was ... knowingly used and intended to be used to facilitate the commission of the continuing criminal enterprise." The instructions and verdict forms told the jurors that to find the Mercedes subject to forfeiture, they had to find beyond a reasonable doubt that the Mercedes "was knowingly used to facilitate the commission of the continuing criminal enterprise." [5] Viewing the evidence and all reasonable inferences in the light most favorable to the government, we conclude that the government carried its burden of showing that the money and the Mercedes were subject to forfeiture.

As to the money, the jury could have reasonably found that Chicago police found the money in Savides' apartment on March 8, 1986, during a major cocaine transaction involving ten kilograms of cocaine that had just arrived from Florida. The jury could have found that the cocaine was being delivered to Savides at that time. From these facts, the jury could reasonably have concluded that Savides was to use the money to pay for the cocaine, or that Savides had received the money in payment for the cocaine, and thus that Savides intended to use the money to facilitate his continuing criminal enterprise.

Savides argues that "[t]he mere propinquity of the money to the cocaine found in the apartment does not *ipso facto* make the money forfeitable," citing *United States v.*

**5.** Section 853(d) establishes a rebuttable presumption that property is subject to forfeiture when the United States establishes by a *preponderance* of the evidence that the defendant acquired the property "during the course of a violation of [subchapters I and II of Chapter 13 of 21 U.S.C.] or within a reasonable time after such period" and "there was no likely source for such property other than the violation of [subchapter I or II]." We recently upheld this provision against constitutional attack in *United States v. Herrero,* 893 F.2d 1512, 1541–44 (7th Cir.1990). Thus, the government was not required to prove beyond a reasonable doubt that Savides' assets were subject to forfeiture. See also *United States v. Sandini,* 816 F.2d 869, 875–76 (3d Cir.1987). The government did not attempt to rely on § 853(d)'s presumption in the district court or this court, and the government does not contend the district court erred by requiring proof beyond a reasonable doubt. Because of this procedural posture, we will analyze the evidence under the reasonable doubt standard. As we will see, the heightened burden of proof does not change the outcome in this case.

*$38,600 In U.S. Currency,* 784 F.2d 694 (5th Cir.1986). That case, however, is distinguishable. In *$38,600,* the government sought forfeiture of money found in a car that also contained a pipe with marijuana residue. *Id.* at 696. The court held that the fact that the money was found in the same car as the pipe was not sufficient to show that the money was used or intended to be used to buy or sell drugs. *Id.* at 697–999. In *$38,600,* however, the money was not found during a major drug transaction, as in this case, nor was there any other evidence, as in this case, of large-scale drug dealing by the money's owner. See *id.* at 698. This case involves much more than the money's mere proximity to cocaine.

Savides also contends that the circumstances in this case indicate that the money was related to his gambling activities rather than any cocaine transaction. According to Savides, the money was intermingled with assorted gambling paraphernalia, including records evidencing substantial bets. But while the jury could have inferred that the money was related to gambling, not cocaine, the jury could have also inferred that the money was related to the cocaine transaction. The choice of which inference to draw was for the jury, and we will not disturb that choice.

 As to the Mercedes, the evidence showed that between December 1986 until January 7, 1987, Savides used the Mercedes while performing his almost daily ritual of driving to the office at 1400 Renaissance Drive, staying for a short time, and then leaving to meet with various people, including cocaine dealing associates. The evidence also showed that the January 8 search of the office turned up 200 grams of cocaine and assorted other items, including empty plastic bags containing cocaine residue, a scale, and a large quantity of small envelopes. Finally, the evidence indicated that Savides had no lawful employment, and that the office had no legitimate use. From all this, the jury could reasonably conclude that Savides' trips to his office and his related activities were to further his cocaine dealing enterprise. Since Sa-

vides used the Mercedes on January 7 to drive to his office and to various meetings, the jury could conclude that Savides used the Mercedes on January 7 to facilitate his cocaine dealing enterprise, and thus that the Mercedes was subject to forfeiture.

6. Sentencing.

The district court sentenced Savides to ten years imprisonment on his conspiracy conviction, to be served consecutively to a sentence of ten years imprisonment on his CCE conviction. The court also fined Savides $100,000 on his conspiracy conviction, and $100,000 on his CCE conviction. (To simplify, we have omitted the rest of Savides' sentence, which is not relevant to the sentencing issue in this case.) Savides contends that the district court erred in imposing cumulative sentences for his CCE and conspiracy convictions. According to Savides, the Supreme Court's decision in *Jeffers v. United States,* 432 U.S. 137, 155–57, 97 S.Ct. 2207, 2218–20, 53 L.Ed.2d 168 (1977) holds that a district court may not impose cumulative sentences for both the conspiracy and the CCE counts, and that the fines and consecutive prison sentences imposed on him are cumulative sentences.

The government first responded to this contention by stating that in *Moya–Gomez,* 860 F.2d at 753–54 (7th Cir.1988), and *United States v. Bond,* 847 F.2d 1233, 1238–39 (7th Cir.1988), this court had held that a court may impose *concurrent* sentences for conspiracy and CCE. From this premise, the government asserted (without explanation) that the *consecutive* sentences the district court imposed in this case were proper. After Savides pointed out in his reply brief the difference between concurrent and consecutive sentences, the government threw up its hands and confessed error, conceding that the district court improperly sentenced Savides on the conspiracy conviction.

We accept the government's confession of error, and thus hold the district court could not impose consecutive prison sentences for conspiracy and CCE or fine Sa-

vides on both convictions.[6] This does not mean, however, that we must necessarily order Savides' sentence reduced to ten years in prison and a $100,000 fine (the sentence imposed on the CCE conviction). As for the prison sentence, the judge thought ten years the appropriate term for the CCE conviction. However, he came to this conclusion under the impression that he could impose a consecutive prison term for conspiracy. This impression turned out to be mistaken. But it is possible the judge would have imposed a longer term on the CCE conviction had he known he could not impose a consecutive sentence on the conspiracy conviction. The judge could have imposed a much longer sentence: the maximum prison term for CCE at the time of sentencing (as it is now) was life without parole.[7] " '[S]entencing should not be a game in which the wrong move by the judge means immunity for the prisoner.' " *United States v. Shue*, 825 F.2d 1111, 1114 (quoting *United States v. DiFrancesco*, 449 U.S. 117, 135, 101 S.Ct. 426, 436, 66 L.Ed.2d 328 (1980)). The district court should have an opportunity to reconsider the prison sentence it imposed for Savides' CCE conviction. There is no double jeopardy problem in doing so. See *Shue*, 825 F.2d at 1114–15; see also *Pennsylvania v.*

*Goldhammer*, 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985).

Similarly, the district judge should have an opportunity to reconsider the fine he imposed on Savides. However, the analysis regarding the fine is a bit more complicated because a question exists as to the maximum fine allowable for a CCE conviction at the time Savides was sentenced. Before October 27, 1986, the maximum allowable fine for a CCE conviction of an individual first offender (Savides being, as far as we can tell, a first offender) was $100,000. On October 27, 1986, Congress passed the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207. That Act raised the maximum fine for an individual first offender of the CCE Act to $2,000,000. *Id.*, § 1252(1), codified at 21 U.S.C. § 848(a) (Supp. V 1987). If the old maximum applies in this case, the most the district court could fine Savides would be $100,000, and remand would be pointless; if the new maximum applies, the district judge could have imposed a larger fine on the CCE conviction.

■ Which maximum applies raises two questions. The first—when did the new maximum become effective?—is easy to an-

---

6. We note, however, the government may have thrown in the towel too soon. In *Bond*, a defendant was convicted of conspiracy and CCE, and the district court imposed $50 special assessments on both convictions pursuant to 18 U.S.C. § 3013(a)(2)(A) on both counts. This court likened the assessments to fines, and stated that "the special assessments ... are cumulative." 847 F.2d at 1239. Nevertheless, we held the assessments were proper, explaining that *Jeffers* did not govern "because the total punishment imposed by the district court is less than the maximum allowed by the CCE Act." *Id.* at 1239; see *Jeffers*, 432 U.S. at 158, 97 S.Ct. at 2220 ("if petitioner received a total of $125,000 in fines on the [conspiracy and CCE] convictions ..., he is entitled to have the fine imposed at the [CCE] trial reduced so that the two fines *together* do not exceed $100,000," the relevant statutory maximum for CCE at that time) (emphasis added). Since, as we shall see, the total fines and prison sentences imposed in this case were less than the applicable maxima under the CCE Act, following *Bond's* reasoning the sentences may not have been illegal. But see *United States v. Alvarez*, 860 F.2d 801, 830–31 n. 31, a post-*Bond* case in which we read *Jeffers* to flatly prohibit any "separate punishment" for CCE and con-

spiracy, and vacated *concurrent* sentences and remanded for resentencing because "the district court may have considered [the defendant's] guilt on the conspiracy conviction in sentencing him on the CCE conviction." Because the government's inadequate treatment of the sentencing issue and confession of error cut off any further argument regarding both the fines and the prison sentences in this case, we consider it unwise to pursue any further the possible effect *Bond* and *Alvarez* might have on this case, or to take a definitive position on that issue. Our decision in this case regarding the legality of Savides' sentence is based on the government's confession of error.

7. At the time the court sentenced Savides, § 848 provided a minimum prison sentence of ten years for a first-time CCE offender. On November 18, 1988, Congress increased the minimum sentence to twenty years. Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 6481(a)(1), 102 Stat. 4181, 4382. Since Congress increased the minimum after Savides' enterprise ended, the increased minimum does not apply to Savides. See the discussion in the text of the ex post facto clause, *infra*.

swer. Since there is no special effective date provision for the part of the Anti–Drug Abuse Act that increased the CCE fines, that increase became effective on October 27, 1986, the date of the Act's enactment. See *United States v. York*, 830 F.2d 885, 892 (8th Cir.1987).

Given that the increased maximum fine became effective in October 1986, the second question is whether applying that increased maximum would violate the ex post facto clause of the Constitution, Art. I, § 9. A law that increases the punishment for a crime committed before the law was passed violates the clause. *Miller v. Florida*, 482 U.S. 423, 429, 107 S.Ct. 2446, 2450, 96 L.Ed.2d 351 (1987); *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). But Savides was charged with conducting a continuing criminal enterprise from 1981 until January 9, 1987, well past the date Congress increased the maximum fine. The evidence was sufficient to show that the enterprise did, in fact, last until January 1987. A statute increasing the penalty for conspiracy does not violate the ex post facto clause when applied to a conspiracy begun before the increase that continued on after the increase. See, e.g., *United States v. Todd*, 735 F.2d 146, 150–51 (5th Cir.1984); *Leyvas v. United States*, 371 F.2d 714, 717 (9th Cir.1967); *United States v. Borelli*, 336 F.2d 376, 386 n. 5 (2d Cir.1964); see also *United States v. Campanale*, 518 F.2d 352, 365 (9th Cir.1975). Professors LaFave and Scott state the principle more generally: "If the conduct ... continues after the enactment or amendment of the statute in question, this statute may be applied without violating the ex post facto prohibition." Wayne R. LaFave and Austin W. Scott, Jr., 1 *Substantive Criminal Law* § 2.4(b), at 142 (1986). CCE and conspiracy, while not the same, are similar crimes. Both punish agreements to commit crimes (such as running a drug enterprise); CCE, unlike conspiracy, also punishes the agreement's success. See *Bond*, 847 F.2d at 1238. Most important, CCE, like an ongoing conspiracy, involves continuing conduct. Thus, there is no reason not to apply to a CCE conviction the general principle that an increased penalty may apply to a continuing crime. Therefore, applying the increased maximum fine to Savides would not violate the ex post facto clause.

Since the increased maximum fine under the CCE statute properly applied to Savides, the district judge could have fined Savides more than $100,000 on the CCE count. It is possible, however, that the judge may not have been aware of the increased maximum fine. He might have imposed a higher fine but for the mistaken impressions that the maximum fine for CCE was only $100,000 and that he could also fine Savides on the conspiracy conviction. Therefore, the district court should have an opportunity to reconsider the fine it imposed.

We therefore vacate Savides' sentence and remand to the district court for resentencing. In resentencing, the judge should keep in mind that he may not take the conspiracy conviction into account when sentencing Savides on the CCE count. See *United States v. Alvarez*, 860 F.2d 801, 830–31 (7th Cir.1988). The judge may impose a concurrent prison sentence for the conspiracy count. See *Bond*, 847 F.2d at 1238–39. The judge may also impose a higher sentence than he did originally on the CCE count, but any sentence imposed on remand must conform to the judge's original sentencing intention. See *Shue*, 825 F.2d at 1115–16; *United States v. Kuna*, 781 F.2d 104, 106 (7th Cir.1986).

## B. *Pace and Besase*

### 1. Arrest and search in Savides' apartment on March 8, 1986.

Pace and Besase filed a motion to suppress the evidence found when police searched them on March 8, 1986, after arresting them in Savides' apartment. The district court denied the motion.

When the police arrived at Savides' condominium on March 8 to execute the gambling search warrant, they found Pace and Besase in the condominium. The police briefly detained the two while the

search went on. Pace and Besase claim that this initial detention violated the Fourth Amendment because the police had no probable cause to believe they were violating any law.

In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court upheld a similar detention. In *Summers*, the police officers were about to search a house for narcotics pursuant to a warrant when they encountered Summers leaving the house. They detained Summers while they searched the house. After finding narcotics in the house and determining that Summers owned the house, the officers arrested and searched Summers, and found heroin in his coat pocket. Summers moved to suppress the heroin, claiming that his initial detention violated the Fourth Amendment. See *id.* at 693–94, 101 S.Ct. at 2589–90.

The Supreme Court upheld the search. The Court again recognized, as it did in *Terry* and other cases, that some intrusions on a person's privacy are "so much less severe" than a traditional arrest that they might be justified absent probable cause. See *id.* at 697, 101 S.Ct. at 2591 (citing *Dunaway v. New York*, 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979)). After balancing the detention's intrusiveness against the governmental interests justifying it, the Court found that Summers' initial detention was reasonable, and therefore proper under the Fourth Amendment.

Pace and Besase contend that *Summers* does not control this case because unlike Summers they were not occupants or residents of Savides' condominium. While this is so, we do not think that this distinction changes the result in this case. At the very least, *Summers'* analysis—balancing the nature of the intrusion against the governmental interests justifying it—applies here. As in *Summers*, the intrusions on Pace's and Besase's privacy interests, while not trivial, were still "substantially less intrusive than" arrests. *Id.* at 702, 101 S.Ct. at 2594. The police merely detained Pace and Besase to take control of the situation before searching. Moreover, the

police did not exploit the detentions to obtain information from Pace or Besase; the police did not search Pace or Besase until they had determined that probable cause existed to arrest. Although the police did pat down Pace and Besase for weapons, the police did not search beyond that until after arresting Pace and Besase. And although the police took a paper bag away from Pace, they did not search the bag until after they had arrested him.

Balanced against this intrusion are the governmental interests justifying the detention. While it turned out that Pace and Besase were not residents of Savides' condominium, it is still significant that they were present in a condominium that a neutral magistrate had found probable cause to believe contained evidence of illegal gambling activities. The police officers could not be sure whether or not Pace and Besase were involved in the gambling, nor could they even be sure whether or not Pace and Basase were "occupants" of the condominium. Thus, as in *Summers*, the connection of Pace and Basase to the condominium gave the officers "an easily identifiable and certain basis" for detaining Pace and Besase during the search. See *id.* at 703–04, 101 S.Ct. at 2594–95.

Another consideration is that gambling involves payoffs and collections of bets, and, therefore large amounts of money. Where large amounts of money are involved, so often are weapons; thus, it was not unreasonable to assume that the people found in Savides' apartment might be armed, or might have access to weapons outside the apartment. Cf. *McNamara v. State*, 357 So.2d 410 (Fla.1978). Therefore, the police officers had valid interests in protecting their own safety, and in preventing possible flight if Pace or Besase happened to be involved, cf. *Summers*, 452 U.S. at 702–03, 101 S.Ct. at 2594; detaining Pace and Besase served those interests. On balance, therefore, we think it was reasonable for the police to protect themselves and assure that the search proceeded smoothly by detaining Pace and Besase while they searched Savides' condominium.

▪ Besides challenging their initial detentions, Pace and Besase also challenge

their subsequent arrests and searches incident to those arrests because the police had no probable cause to arrest them. According to Pace and Besase, *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) controls this case. In *Ybarra,* the police had obtained a warrant to search a tavern for narcotics the bartender allegedly possessed and was selling. Upon entering the tavern, the officers frisked each of the tavern's customers, including Ybarra. *Id.* at 88, 100 S.Ct. at 340. While frisking Ybarra, an officer felt an object that he described as "a cigarette pack with objects in it." *Id.* After frisking the other patrons, the officer went back to Ybarra, and removed the cigarette pack from Ybarra's pants pocket. In the cigarette pack, the officer found heroin. *Id.* at 89, 100 S.Ct. at 341. Ybarra moved to suppress the heroin at his trial. The Supreme Court held that the search was illegal, rejecting the argument that probable cause existed to initially search Ybarra.[8]

In *Ybarra,* the search occurred in a public tavern, from which numerous people could be expected to come and go. Ybarra was one of several patrons in the tavern, and did nothing to arouse any suspicion that he was committing any crime. In this case, however, the police found ten kilograms of cocaine in a private dwelling in which the public was not invited to come and go. While *Ybarra* may not apply only to public places, we agree with the district court that it is significant that Pace and Besase were present in Savides' condominium with large amounts of cocaine and money lying in the open. See 664 F.Supp. at 1550. It was reasonable to conclude that Pace and Besase were invited to Savides' condominium rather than being there merely by happenstance. In *United States*

*v. Perry,* 747 F.2d 1165 (7th Cir.1984), we noted that "it strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where that person did not have [the dealer's] utmost trust and confidence." *Id.* at 1169. That trust and confidence most likely arose, we noted, because the person accompanying the dealer was involved in the deal. *Id.* We held that this common-sense intuition helped support an inference of guilt beyond a reasonable doubt, see *id.*; it certainly is sufficient to at least give rise to a reasonable suspicion (if not probable cause) that the person present during the deal is somehow involved in the deal.

Furthermore, the Court in *Ybarra* held that "mere propinquity, *without more,*" was insufficient to support probable cause. In this case there was more. The police observed both Pace and Besase exiting rooms in which the police found large amounts of either cocaine or money. This, along with the fact that Savides trusted Pace and Besase enough to have them at his home with the money and cocaine out in the open, could lead a reasonable person to conclude that it was reasonably probable that Pace and Besase were involved in a large-scale cocaine deal with Savides. Thus, the police had probable cause to arrest Pace and Besase. The subsequent searches of Pace and Savides were proper as searches incident to their arrests. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The district court thus properly denied Pace's and Besase's motions to suppress the evidence found in those searches.

2. Seizures and searches of Pace's and Besase's cars.

Pace and Besase contend that the district court should have suppressed all evidence

---

**8.** The Court also rejected the state's alternative contention that the initial pat-down was a reasonable frisk for weapons under *Terry v. Ohio* that turned up probable cause that justified the second search. See 444 U.S. at 92, 100 S.Ct. at 342. According to the Court, Ybarra's presence in the bar when the officers searched it did not justify a frisk under *Terry* because the frisk was not supported by a reasonable belief that Ybarra was at the time armed and dangerous. *Id.* This part of *Ybarra* does not affect our holding that

Pace's and Besase's initial detentions were reasonable; *Summers,* not *Ybarra,* governs the detention. While the police did frisk Pace and Besase for weapons, and did seize the paper bag from Pace, the frisks and the seizure did not turn up any evidence or contribute to the finding of probable cause to arrest. Therefore, even if the frisks and seizure of the bag were technically illegal, they do not affect the legality of the subsequent arrests and searches.

discovered when the police searched their cars after seizing the cars the day after their arrest in Savides' condominium. According to Pace and Besase, both the seizures and searches violated the Fourth Amendment.

■ Pace and Besase contend that the police violated the Fourth Amendment by seizing their cars without warrants. We agree with the district court that no warrant was required. The officers seized Pace's and Besase's cars pursuant to Illinois and federal forfeiture statutes because the officers believed that Pace and Besase had used the cars to drive to Savides' condominium for the cocaine deal. Ill.Ann. Stat., ch. 38, para. 36–1 provides that police officers may seize any vehicle used in committing a violation of the Illinois Controlled Substance Act. At least one Illinois court has held that police may seize vehicles pursuant to para. 36–1 without a warrant. See *People v. One 1974 Chevrolet Corvette*, 117 Ill.App.3d 616, 73 Ill.Dec. 65, 67, 453 N.E.2d 890, 892 (2d Dist.1983).

Pace and Besase contend that para. 36–1 does not authorize warrantless seizures, citing *People v. Drummond*, 103 Ill.App.3d 621, 59 Ill.Dec. 332, 431 N.E.2d 1089 (1st Dist.1981). In *Drummond*, the state attempted to justify an allegedly illegal warrantless search of a van by relying on para. 36–1. The court held that the state mistakenly relied on para. 36–1 because "the fact that a vehicle may be subject to seizure under section 36–1 does not cause the loss of a person's Fourth Amendment right to be free from unreasonable searches and seizures." *Id.* 59 Ill.Dec. at 334, 431 N.E.2d at 1091. We do not read this cryptic statement as addressing whether or not para. 36–1 requires a warrant before seizure; rather, we read it as a comment on whether the Fourth Amendment would allow such warrantless seizures and searches.[9] Moreover, since the issue in *Drummond* was whether a *search* was proper, *Drummond* is not authority on whether para. 36–1 allows a warrantless *seizure.*

Pace and Besase contend that even if the Illinois forfeiture statute allows warrantless seizures, the Fourth Amendment does not. The weight of authority, however, holds that police may seize a car without a warrant pursuant to a forfeiture statute if they have probable cause to believe that the car is subject to forfeiture. See, e.g., *United States v. Valdes*, 876 F.2d 1554, 1558–60 (11th Cir.1989); *United States v. $29,000—U.S. Currency*, 745 F.2d 853, 856 (4th Cir.1984); *United States v. One 1978 Mercedes Benz*, 711 F.2d 1297, 1302 (5th Cir.1983); *United States v. One 1977 Lincoln Mark V Coupe*, 643 F.2d 154, 158 (3d Cir.1981); *United States v. One 1975 Pontiac LeMans*, 621 F.2d 444, 450 (1st Cir. 1980) (citing cases).[10] We agree with the majority approach. The federal courts' overwhelming approval of warrantless for-

9. To the extent that this comment might imply that warrantless seizures of vehicles pursuant to valid forfeiture statutes violate the fourth amendment, we disagree with the comment, as will become apparent later.

10. Pace and Besase cite two circuit court cases that they say hold otherwise. One of those cases, *United States v. Pappas*, 613 F.2d 324 (1st Cir.1979) (en banc), held that 21 U.S.C. § 881, a federal civil forfeiture statute, did not permit warrantless seizures absent both probable cause and exigent circumstances. *Id.* at 328–30. The court reached that conclusion, in part, to avoid the question whether a warrantless seizure pursuant to § 881, on probable cause alone, would violate the Fourth Amendment. *Id.* at 329. Thus, although the *Pappas* court suggested that such a seizure might be illegal, it never decided the issue. See *One 1975 Pontiac LeMans*, 621 F.2d at 450 n. 6. The First Circuit subsequently held that a warrantless seizure of a car supported by probable cause to believe the car is forfeitable is proper, even absent exigent circumstances. See *id.* at 450.

In *United States v. McCormick*, 502 F.2d 281 (9th Cir.1974), the Ninth Circuit held that the Fourth Amendment does not allow a warrantless seizure of a car based on probable cause to believe the car is subject to forfeiture, absent exigent circumstances or some other exception to the warrant requirement. See also *United States v. Spetz*, 721 F.2d 1457, 1468–70 (9th Cir.1983). The Ninth Circuit later noted that its decision in *McCormick* departed from a long line of case law in other circuits. See *United States v. Karp*, 508 F.2d 1122, 1125 (9th Cir. 1974) (citing cases). The Ninth Circuit stands alone among the federal circuits in requiring that police obtain a warrant to seize a car that they have probable cause to believe is subject to forfeiture.

feiture seizures based on probable cause, along with the historical acceptance of the constitutionality of such searches, are evidence that such searches have been generally accepted as reasonable. See *United States v. Bush,* 647 F.2d 357, 370 (3d Cir. 1981) (citing cases). It is difficult to ignore this general acceptance. Furthermore, under a civil forfeiture statute, "the vehicle ... is treated as being itself guilty of wrongdoing." *United States v. One Mercedes Benz 280S,* 618 F.2d 453, 454 (7th Cir.1980). Thus, seizing a car from a public place based on probable cause is analogous to arresting a person outside the home based on probable cause. Such an arrest, even without a warrant, does not violate the Fourth Amendment, although it is possibly a more significant intrusion on privacy interests than seizing an unoccupied car. See *Bush,* 647 F.2d at 370 (citing *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)); see also *Valdes,* 876 F.2d at 1559; *One 1978 Mercedes Benz,* 711 F.2d at 1302. And the Supreme Court has approved warrantless seizures in a similar situation. In *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), Internal Revenue Service agents seized cars subject to tax liens without a warrant. The Court held that the seizures did not violate the Fourth Amendment; the agents had probable cause to believe that the cars were subject to seizure, and the seizures took place "on public streets, parking lots, or other open places." See *id.* at 351–52, 97 S.Ct. at 627–28; *G.M. Leasing* provides strong support for the majority position. See *One 1975 Pontiac LeMans,* 621 F.2d at 450, which adopted the panel's reasoning in *United States v. Pappas,* 600 F.2d 300, 304 (1st Cir.), *vacated* 613 F.2d 324 (1st Cir. 1979); *Bush,* 647 F.2d at 369; see also 3 Wayne R. LaFave, *Search and Seizure* § 7.3(b), at 83 (2d ed. 1987). For all these reasons, we conclude that it was proper for the police to seize Pace's and Besase's cars from the parking lot of Savides' condominium complex, if the police had probable cause to believe the cars were subject to forfeiture.

■ We have no problem concluding that probable cause existed. The officers who seized the car knew of the circumstances surrounding Pace's and Besase's arrests, so they had probable cause to believe that Pace and Besase had been involved in a major cocaine transaction the day before at Savides' condominium. The officers also had probable cause to believe that Pace and Besase had driven the seized cars to the condominium complex to participate in the transaction. Neither Pace nor Besase lived in the complex, so they had to get there somehow. The police could reasonably infer that Besase drove his car there. Pace did not own the car that the police seized from him. However, the officer who seized the car knew that the car was registered to an Angelo Pace who lived at one of the addresses that the officer knew Pace, the defendant, used. Thus, the police could reasonably infer that Pace drove that car to Savides' condominium complex the previous day. Since the police could reasonably believe that Besase and Pace had used the cars to commit a violation of Illinois drug laws, the police had probable cause to believe the cars were subject to forfeiture. Since the police had probable cause, seizing the cars did not violate the Fourth Amendment.

After seizing Pace's and Besase's cars, the police searched the cars and some of the cars' contents several times. Specifically, the police searched Pace's car in the condominium parking lot before transporting the car to the police station. During the search, the police found a record book and a personal address book, which they paged through and determined were drug record books. The police also searched Besase's car at the police station, and found several receipts that indicated Besase had been in Georgia and Indiana a few days earlier. A few days later, the police searched Besase's car again and found a secret compartment that turned out to contain traces of cocaine.

■ Pace and Besase contend that the warrantless searches violated the Fourth

Amendment.[11] The district court held that the initial searches of Pace's and Besase's cars, along with the initial examination of the books and receipts found, were lawful inventory searches. See 664 F.Supp. at 1552–53; see generally *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). The district court further held that the later search of Besase's car that turned up the cocaine traces was justified by the automobile exception to the warrant requirement. See 664 F.Supp. at 1554–55; (citing *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). Pace and Besase argue that all the searches exceeded the scope of a valid inventory search.

We agree with the district court that the search of Pace's car, the initial search of Besase's car, and the initial examinations of the record books and receipts were justified as legal inventory searches. When police lawfully seize a vehicle, they have a right to inventory the car's contents, as long as they conduct that inventory pursuant to standard police procedures. See *Bertine*, 479 U.S. at 371–72 and 374 n. 6, 107 S.Ct. at 741–42 and 742 n. 6. During the inventory, the police may open closed containers they find inside the car to inventory the contents of those containers. See *id.* at 374, 107 S.Ct. at 742.

■ The officers testified that the inventories they conducted, including leafing through the pages of the record books and examining the receipts, were pursuant to Chicago police procedures. The reason for leafing through the record books was to determine whether any items, such as credit cards, might be stuck between the pages; the reason for examining the receipts was to properly identify them for the inventory. Pace admits that the inventory of his car was pursuant to department procedure, and neither Pace nor Besase seriously challenge the officers' testimony that leafing through the record books and examining the receipts was pursuant to departmental procedure. Therefore, we conclude that

the searches were pursuant to police procedure. Moreover, briefly leafing through the record books and examining the receipts is analogous to inventorying the closed container in *Bertine;* consequently, we conclude that those actions were lawful under the Fourth Amendment. See *United States v. Arango–Correa*, 851 F.2d 54, 59 (2d Cir.1988).

The officer leafing through the record books in Pace's car noticed what he perceived to be cryptic drug codes. The district court found that the books' incriminating nature was "readily apparent." 664 F.Supp. at 1553. This finding is not clearly erroneous. That being so, the police were entitled to seize the books as evidence of a crime found in plain view. See *United States v. Edwards*, 885 F.2d at 389. Subsequent detailed examinations of the books did not violate the Fourth Amendment; once the police have lawfully seized and searched an item, subsequent warrantless searches of that item are lawful so long as the item remains in the police's continuous possession. See *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir.1983).

■ Similarly, it was proper to seize the receipts from Besase's car. The receipts on their face showed that Besase had been in Georgia and Indiana a few days earlier. The searching officers knew that the officers who had arrested Besase had seized a receipt from a Daytona, Florida hotel showing Besase had stayed there on March 6. Thus the officers could reasonably conclude that Besase had recently driven from Florida to Chicago. Florida is a known source state for narcotics, and Besase had been arrested on March 8 for possessing ten kilograms of cocaine. Therefore, it was reasonable for the officers to conclude that the receipts were evidence indicating that Besase had transported the cocaine to Savides' condominium, so it was proper for the police to seize the receipts.

■ That leaves the search of Besase's car a few days after the seizure which turned up the secret compartment and

11. Besase also contends that the police violated the fourth amendment by cursorily searching his car the night he was arrested. However,

since that search turned up nothing incriminating, it is irrelevant to Besase's motion to suppress.

traces of cocaine. Besase argues that this search went far beyond a valid inventory search. We tend to agree with this argument, but the problem with the argument is that the district court agreed with it also. Instead of upholding the search as an inventory search, the district court upheld the search under the automobile exception to the warrant requirement. See 664 F.Supp. at 1554. Besase does not challenge this reason for upholding the search, and presents no authority for questioning the district court's decision. It would thus be fair to hold that Besase has waived his challenge to this search. See Fed.R.App.P. 38 (argument in brief must cite relevant authorities); cf. *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1254 (7th Cir.1989) (failure to challenge a sufficient ground upon which the district court based its judgment waived the challenge to the judgment).

Whether the automobile exception justifies the search of Besase's car at the police station is not clear. The automobile exception generally applies where police officers have seized a car and have probable cause to believe, at the time of the seizure, that the car is carrying contraband. See generally *Ross*, 456 U.S. at 804–09, 102 S.Ct. at 2162–65; *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It is true that the automobile exception does not require an immediate search; the police may lawfully seize the car, and then search it later. See *Florida v. Meyers*, 466 U.S. 380, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam); *Michigan v. Thomas*, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam); *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (per curiam); see also *United States v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). But in all these cases, it appears that the police could have legally searched the cars at the time of seizure based on probable cause. Therefore, these cases may simply stand for the proposition that "whenever a warrantless at-the-scene search of a vehicle would be permissible, the police may instead seize the car and search it shortly thereafter at the station."

3 Wayne R. LaFave, *Search and Seizure* § 7.2(b), at 32 (2d ed. 1987).

In this case, the government does not contend that probable cause existed to search Besase's car at the time of his arrest or at the time police seized it. Therefore, it is debatable whether the automobile exception justifies the later search at the police station. Because Besase has not raised this issue, however, we need not actually decide it.

Even if Besase had convincingly argued that the automobile exception did not justify the later search of his car, we would still uphold the search under *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The police seized Besase's car pursuant to a forfeiture statute, and were holding the car pending forfeiture proceedings. In *Cooper*, police had impounded a car pursuant to a state forfeiture statute. About one week after seizing the car, the police searched the car's glove compartment without a warrant (or, apparently, probable cause) and found incriminating evidence. *Id.* at 58, 87 S.Ct. at 788. The Court held that the search did not violate the Fourth Amendment. *Id.* at 61–62, 87 S.Ct. at 790–91.

*Cooper*'s rationale, and thus its scope, are not entirely clear. It is possible to read *Cooper* broadly, as authorizing a warrantless investigative search of a car based solely on the fact that the car is subject to seizure under a forfeiture statute. It is also possible to read *Cooper* narrowly, as merely authorizing noninvestigative inventory searches of cars legitimately in police custody. For a discussion of *Cooper*'s scope, see *United States v. Johnson*, 572 F.2d 227, 230–34 (9th Cir.1978). Although some Supreme Court dicta have described the search in *Cooper* as an inventory search, see *id.* at 231 (citing *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973) and *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976)); see also *Bertine*, 479 U.S. at 372, 107 S.Ct. at 741, the Supreme Court has never expressly limited *Cooper* to inventory searches. Other Supreme Court dicta indi-

cate that the search in *Cooper* was justified by the police's possessory interest in the vehicle arising from its lawful seizure. See *Johnson*, 572 F.2d at 233 n. 14 (citing *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)). In his dissent in *Cady v. Dombrowski*, Justice Brennan, joined by three other justices, wrote that *Cooper* stood for "another exception to the warrant requirement ... which sustains a search in connection with the seizure of an automobile for purposes of forfeiture proceedings. In *Cooper* ... the search was sustainable as an integral part of [the police's] right of retention." 413 U.S. at 452–53, 93 S.Ct. at 2533–34 (Brennan, J., dissenting).

While the Supreme Court has not definitely described *Cooper*'s scope, the federal courts of appeals that have had to apply *Cooper* and its progeny, including this court, have overwhelmingly read *Cooper* broadly. The cases generally hold that where police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the police may search the car without a warrant. See, e.g., *United States v. Alvarez*, 833 F.2d 724, 728–29 (7th Cir.1987); *United States v. Edge*, 444 F.2d 1372, 1375 (7th Cir.1971); *United States v. $29,000—U.S. Currency*, 745 F.2d 853, 856 (4th Cir.1984); *United States v. Harris*, 727 F.2d 401, 405 (5th Cir.1984); *United States v. Merryman*, 630 F.2d 780, 785 (10th Cir.1980); *Johnson*, 572 F.2d at 234; *United States v. Zaicek*, 519 F.2d 412, 414–15 (2d Cir.1981); *United States v. Young*, 456 F.2d 872, 875 (8th Cir.1972).[12] As this court recently noted in *Alvarez*, "once a vehicle is validly seized for forfeiture, it can be searched *at will*, without a warrant." 833 F.2d at 728 (emphasis added).

The search of the rear seat compartment in Besase's car was legal under this interpretation of *Cooper*. The police had lawfully seized Besase's car, and were holding it pursuant to a forfeiture statute. As in *Cooper* and *Alvarez*, the search was closely related to the reason for Besase's arrest

and the reason for retaining the car: Besase's alleged involvement in cocaine distribution. See *Cooper*, 386 U.S. at 61, 87 S.Ct. at 790; *Alvarez*, 833 F.2d at 729. Thus, the district court properly refused to suppress the evidence found in that search.

## C. *Cialoni*

### 1. Severance.

■ Cialoni filed a motion for severance in the district court pursuant to Fed. R.Crim.P. 14. The court denied the motion. Cialoni claims this was error.

Rule 14 provides that "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants ... the court may ... grant a severance of defendants." Whether to grant a severance motion is within the district court's discretion. See *Moya–Gomez*, 860 F.2d at 767. A defendant moving for severance must make a "'strong showing of prejudice.'" *Id.* at 768 (quoting *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984)). The fact that a defendant might have had a better chance of acquittal in a separate trial is not enough to warrant severance under Rule 14. *Id.*

Cialoni claims that he was merely a minor member of Savides' enterprise and that the most damaging testimony concerned events that occurred after he had left the conspiracy. According to Cialoni, there was great potential that he would be convicted not on the evidence against him but rather on evidence that spilled over from the case against the other defendants. Cialoni contends that this danger was exacerbated because the evidence against the other defendants was grossly disproportionate to the evidence against him.

Cialoni's argument is unconvincing. The evidence against Cialoni was substantial, and included his own statements to DEA agents. Moreover, the court instructed the jury to give separate consideration to each defendant and to decide each defendant's

---

**12.** Inexplicably, while suggesting that *Cooper* might justify the search of Besase's car at the police station, the government cited none of the courts of appeals' authority overwhelmingly supporting its position.

case solely on evidence relating to that defendant. Cialoni's role in Savides' enterprise was well defined, and the evidence concerning his role was not complex, so that the instruction adequately protected Cialoni from the danger of evidentiary spillover, juror confusion, and accumulation of evidence. See *Moya–Gomez*, 860 F.2d at 768. The district court did not abuse its discretion in denying Cialoni's severance motion.

2. Statements to DEA agents.

Cialoni contends that the district court erred by not suppressing incriminating statements he made to DEA agents. According to Cialoni, the statements were involuntary because the agents induced them by making false promises. See *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). Specifically, Cialoni contends that the DEA agents promised him that his statements would be "confidential," and thus that he was not a target of the DEA's investigation, and that they would tell the prosecutor in a pending state prosecution about Cialoni's cooperation.

■ The district court, after hearing testimony from Cialoni and the two DEA agents who spoke to him, found that the agents promised Cialoni only that they would inform the state prosecutor about Cialoni's cooperation if the information he gave turned out to be truthful and valuable in investigating Savides and his associates. The court also found that Cialoni agreed to stay in contact with the agents to provide more detailed information, and that Cialoni had failed to live up to his end of the bargain. See 664 F.Supp. at 1556–57. These findings are not clearly erroneous. Any contention that the agents impliedly promised that Cialoni was not a "target," that is, that his statements might not be used against him, is contradicted by the fact that the agents read Cialoni his *Miranda* warnings before he made any statements. The court found that Cialoni "fully understood" these warnings, see *id.* at 1557, a finding the district court was uniquely situated to make. Consequently, since Cialoni was aware that his statements

could be used against him, it was not clear error to find that no promises of confidentiality or non-use were made, or that any such promises did not induce Cialoni's statements.

■ The only issue here is whether the agents' promise that they would inform the state prosecutor about Cialoni's cooperation, and their alleged failure to keep that promise, violated Cialoni's Fifth Amendment right against self-incrimination. This court, and others, have held that promises to notify a prosecutor of a defendant's cooperation are not sufficiently coercive to render the defendant's subsequent statements involuntary. See *United States v. Rodgers*, 755 F.2d 533, 546 (7th Cir.1985); *United States v. Springer*, 460 F.2d 1344, 1346–47 (7th Cir.1972); *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985). This is especially so in this case. Cialoni is a man in his fifties, whom the district court found to be intelligent and perceptive. Cialoni also had experience dealing with law enforcement agencies, and was aware when he spoke that his statements could be used against him. Given all this, we agree with the district court that the promise to make his cooperation known to the state prosecutor did not overbear Cialoni's will and make his statements involuntary. Cf. *United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir.1985). Therefore, the district court did not err in denying Cialoni's motion to suppress the statements.

III.

For the reasons stated above, we AFFIRM the defendants' convictions. We vacate Savides' sentence and REMAND the case to the district court to resentence Savides. Circuit Rule 36 shall not apply.