In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1559

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTOINE RICHMOND,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2016-cr-197-PP — **Pamela Pepper**, *Judge.*

ARGUED SEPTEMBER 24, 2018 — DECIDED MAY 13, 2019

Before WOOD, *Chief Judge*, and EASTERBROOK and
BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Antoine Richmond entered a conditional plea of guilty to possessing a firearm as a felon. Before entering his plea, Richmond moved to suppress a handgun police seized from the threshold of his residence's front door during an encounter on his porch. The district court denied Richmond's motion, and he now appeals the court's ruling. We affirm the judgment of the district court.

## I. BACKGROUND

### A. *The Search and Arrest*

The night of October 11, 2016, Milwaukee Police Officers Chad Boyack and Anthony Milone were patrolling a residential neighborhood police refer to as the "Capitol Street Corridor." This area in Milwaukee is known for drug trafficking, armed robberies, and gun violence. Shortly before midnight, as they drove their marked squad car through an intersection, both officers saw Richmond walking toward them on a sidewalk. Richmond strode with his left hand free at his side and his right hand in the "kangaroo" pocket on the front of his T-shirt. Officer Milone saw "a significant bulge" from this pocket, and Officer Boyack described the bulge as a "medium-sized to larger object" protruding through Richmond's front pocket. In their experiences and training as police officers—almost 20 years for Boyack, and 6 years for Milone—front pocket bulges like this typically concealed a firearm. They suspected the same here.

Richmond made eye contact with Boyack as the squad car approached. After the officers passed Richmond, he changed direction, quickened his pace, crossed the front lawn of a residential duplex, and moved toward the stairs up to its front porch. Unknown to the officers, Richmond was walking across the yard to get to the front door of a duplex where he lived.[1] Seeing the suspicious bulge in Richmond's front

---

[1] Richmond's girlfriend resided at the duplex, and Richmond had been living there for about one month before his arrest.

pocket and his unusual change of course prompted the officers to make a sharp U-turn and park in front of the duplex to talk with Richmond.

As the officers exited their squad car, Richmond walked up the porch's five stairs toward the front door. Boyack and Milone followed and, from about 20 to 25 feet away, they saw Richmond open the outer screen door with his left hand, bend down, and with his right hand place a dark, medium-sized object on the doorframe between the screen door and front door, which was closed. The front porch light illuminated Richmond's action, but the officers could not make out what Richmond placed on the threshold. Nor could they observe the stashed object as they approached, as the bottom third of the screen door was opaque. They suspected Richmond hid a gun. Their suspicions were based on their experiences on patrol, including with persons licensed to carry concealed weapons. To them, hiding a gun on the floor behind an unlocked screen door in response to approaching police was not typical of a concealed-carry license holder.

After Richmond placed the object on the doorframe, he closed the screen door and turned around as the officers walked up to the porch. Boyack asked Richmond if he had heard shots, if he was carrying a weapon, and what he was doing at the duplex. Richmond answered no to the first two questions, and replied that the house was his girlfriend's. While Boyack questioned Richmond, Milone walked up onto the porch toward the screen door, which put Richmond between the two officers.

While Boyack asked questions, Milone opened the screen door "as little as possible" and saw a black semi-automatic .40

caliber handgun resting where the officers observed Richmond place the dark, medium-sized object from his pocket. According to Milone, Richmond stood within the screen door's swing radius because he could open it only partially without hitting Richmond's back. After seeing the gun, Milone immediately used code to alert his partner of the presence of a firearm and possible arrest. Boyack then asked Richmond if he was a convicted felon. Richmond confirmed he was, so the officers arrested him. The entire encounter from when the officers first observed Richmond walking on the sidewalk to Milone seeing the gun and Richmond confirming he was a felon lasted no more than thirty seconds.

## B. *Evidentiary Hearings on Motion to Suppress*

After being indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), Richmond moved to suppress the gun, arguing Milone's act of opening the screen door constituted a warrantless search on the curtilage of his home without legal justification.

Two evidentiary hearings were held on Richmond's motion. After the first, a magistrate judge issued a report recommending the motion be denied for two reasons: the officers had reasonable suspicion to make an investigatory stop of Richmond, and the search behind the screen door was appropriate to ensure their safety. Richmond objected to the magistrate judge's report, and the district judge held a second hearing to personally evaluate the officers' testimony.

Boyack and Milone testified at both hearings and were sequestered during their examinations. Their accounts of the facts leading up to Richmond's arrest were consistent with each other and at each hearing, except before the district judge

in one respect: where Richmond stood on the porch when Milone opened the screen door. Boyak testified Richmond, after placing the gun in the doorframe, stepped away from the door and walked down to the second step of the porch. Milone said everyone remained on the top landing of the porch, and Richmond remained close to the screen door.

Although Boyack and Milone gave differing accounts of Richmond's specific location on the porch, the officers each stated Richmond could access what they had suspected was a gun. The officers also testified Richmond was calm throughout their interaction. Even still, the officers each feared that Richmond could bolt toward the door to arm himself, as the officers have experienced in the past with other suspects. Richmond's large stature heightened the officers' concern. Boyack testified Richmond was a "very well-built, muscular" man, and at the hearing the district court verified the accuracy of this description. The officers were similarly concerned about unknown duplex occupants because a potentially loaded gun lay exposed in the doorway, posing a danger to anyone outside or inside the house.

### C. Order Denying Suppression

After the second evidentiary hearing, the district court adopted the magistrate judge's recommendation and denied Richmond's motion to suppress. The court concluded that the combination of facts described above gave the officers reasonable suspicion that Richmond was doing something unlawful as he walked down the street and headed toward the porch.

Also, based on these facts, the district court ruled the officers performed a lawful protective search under *Terry v.*

*Ohio*, 392 U.S. 1 (1968). The court relied on Richmond's exhibits to confirm the porch was narrow, so regardless of whether Richmond remained near the door (per Milone) or moved onto the porch steps (per Boyack), Richmond stood unrestrained within a stride or two of the gun and could have armed himself quickly had he so chosen. Last, the district court noted *Terry* searches are not restricted to the suspect's person, and ruled that Milone's search was justified as narrowly confined to the only place from which the officers had reason to believe Richmond could obtain a weapon.

## II. DISCUSSION

When considering a district court's denial of a motion to suppress, we review its legal conclusions de novo and its findings of fact for clear error. *United States v. Howard*, 883 F.3d 703, 706–07 (7th Cir. 2018). We give due weight, as we must, to a trial court's assessment of the officers' credibility and the reasonableness of their inferences. *Ornelas v. United States*, 517 U.S. 690, 700 (1996) (requiring reviewing courts to review findings of historical fact only for clear error and give due weight to factual inferences drawn by resident judges and local law enforcement officers); *Howard*, 883 F.3d at 707 (holding the same). "Because the resolution of a motion to suppress is a fact-specific inquiry, we give deference to credibility determinations of the district court, who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing." *United States v. Groves*, 530 F.3d 506, 510 (7th Cir. 2008) (internal quotations omitted).

We examine first whether the officers reasonably suspected that Richmond was engaged in criminal activity, and second whether Milone's search behind the screen door eclipsed a constitutional boundary.

### A. *Reasonable Suspicion of Unlawful Activity*

A limited intrusion into an individual's privacy is permitted under the Fourth Amendment where the police have reasonable suspicion to believe criminal activity is afoot. *See Terry*, 392 U.S. at 30; *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). Reasonable suspicion exists when an officer can point to "'specific and articulable facts which, taken together with rational inferences from those facts[,] reasonably warrant that intrusion.'" *Baskin*, 401 F.3d at 791 (quoting *Terry*, 392 U.S. at 21).

When making reasonable suspicion determinations, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). Reasonable suspicion requires more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

With these standards in mind, we examine the facts on which the officers formed their suspicions, and whether the district court erred in its reasonableness assessment.

Four categories of facts created a suspicion that Richmond was illegally carrying a gun or was otherwise engaged in unlawful activity: (1) Richmond was walking down the street near midnight in a neighborhood plagued by drug trafficking and gun violence; (2) there was a significant bulge in Richmond's front T-shirt pocket as he walked down the street; (3) in the officers' over 25 combined years' of police training and experiences, a protrusion like this was more often than

not a gun; and (4) after the officers passed Richmond in their marked squad car, Richmond quickened his pace, changed his direction, cut across a property, and hid what they suspected was a gun between the screen door and front door.

Richmond contends none of the factors articulated by the officers at the suppression hearings, standing alone, are illegal conduct. He emphasizes he was walking home and, after seeing the officers, continued on that path to his residence. Richmond insists that, as far as the officers knew, he may have been licensed to carry a concealed firearm. *See* WIS. STAT. § 175.60 (permitting persons age 21 and older who have not been convicted of a felony to obtain a concealed-carry license).

Richmond's points miss the forest for the trees: when evaluating the reasonableness of a police intrusion, we look at the totality of circumstances and "must not be overly focused on any one factor." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).

Richmond's presence in a neighborhood beset by drug trafficking and gun violence does not, by itself, support a particularized suspicion that he was committing a crime. But it is among the relevant contextual considerations in a reasonable suspicion analysis. *See, e.g.*, *Wardlow*, 528 U.S. at 124–125 (concluding defendant's evasive behavior in a high crime area and unprovoked flight after seeing the police had aroused a reasonable suspicion that he was engaged in criminal activity); *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (holding same). A suspect's evasive behavior, and the experience of the officers, are also relevant factors. *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (evasive behavior); *Jackson*, 300 F.3d at 746 (officer experience).

That Richmond changed his direction to head home does not alter the analysis. The officers did not know he lived at the duplex when they pulled over and approached him on the porch. And both officers testified he was not acting the way someone with a concealed-carry license would act on their own property. "[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." *Baskin*, 401 F.3d at 793. Richmond's innocent explanations—including a hypothetical concealed-carry license—do not discharge all other relevant facts from consideration. Richmond argues this is new territory, as the Supreme Court has yet to directly address the constitutionality of a *Terry* stop within a home's curtilage. He cites Ninth, Tenth, and Eleventh Circuit cases to argue *Terry* does not justify a stop, seizure, or search inside the home. But none of these cases concern a protective search for weapons by officers lawfully within the curtilage of a home.[2]

---

[2] Richmond cites *Moore v. Pederson*, 806 F.3d 1036, 1044–46 (11th Cir. 2015) (involving the warrantless seizure of a suspect inside his home); *United States v. Perea-Rey*, 680 F.3d 1179, 1188–89 (9th Cir. 2012) (holding a border patrol agent intruded into an area of curtilage where uninvited visitors would not be expected to appear to stop an individual suspected of entering the country illegally); *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (holding the warrantless entry by two officers into a fully enclosed backyard—one officer kicking open a padlocked gate and the other scaling a fence—was not supported by probable cause, *Terry*, or exigent circumstances); and *United States v. Reeves*, 524 F.3d 1161, 1167–69 (10th Cir. 2008) (involving the warrantless seizure of a suspect inside his motel room and construing the encounter as occurring within the home). *Perea-Rey* and *Struckman* proscribed police entries without consent into cordoned areas of curtilage. But Richmond acknowledges that Boyack and Milone were permitted to enter onto the porch even without his consent,

On this topic, this court has allowed a *Terry* stop in a structure attendant to a house. In *United States v. Pace*, 898 F.2d 1218, 1223 (7th Cir. 1990), we applied *Terry* to uphold the stop of a defendant in his condominium garage, supported by reasonable suspicion alone. There, the officer was pursuing the defendant, whom the officer suspected might be a mob assassin on his way to kill another condominium resident. *Pace*, 898 F.2d at 1229. Upon discovering he was being followed, the defendant took what the officer considered to be evasive action. *Id*. When the defendant entered the garage, the officer had to decide whether to pursue him to investigate his suspicion or to let him go despite the threat he might have posed to another resident. *Id*. We balanced the potential for harm against the intrusion on the defendant's privacy and held both the officer's suspicion and entry were reasonable. *Id*. (citing *Terry*, 392 U.S. at 21–22 and *Michigan v. Long*, 463 U.S. 1032, 1046 (1983)).

Like the police in *Pace*, Boyack and Milone articulated objectively reasonable grounds to suspect Richmond was engaged in criminal activity that justified their entry onto the porch. Richmond describes the facts differently. But "[t]he need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative

---

Brief of Appellant at 7, 15, unlike the closed off areas in *Perea-Rey* and *Struckman*. He also acknowledges that he consented to the officers' presence on the porch. Brief of Appellant at 7, 16–17, 19. *Reeves* and *Moore* addressed the warrantless seizures of suspects inside their homes without probable cause, exigent circumstances, or consent. Richmond does not contest his seizure on appeal, nor did any police activity occur inside his girlfriend's house.

stops." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016). Because the aggregate facts support a particularized and objective basis for the officers to suspect Richmond was engaged in criminal activity, their suspicions were reasonable within the meaning of the Fourth Amendment.

The sum of all the information known to officers at the time of the stop is considered, including the behavior and characteristics of the suspect. *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014). Here, that information included specific and articulable facts which taken together fostered Boyack's and Milone's reasonable suspicion that "criminal activity is afoot."

### B. The Search

We next address whether Milone exceeded the permissible scope of *Terry* when he partially opened the screen door to search for a gun.

Richmond depicts his exchange with the officers as a "consensual encounter," not an investigatory stop.[3] In so doing, he acknowledges the officers were permitted to enter onto the porch area to ask him questions to dispel their suspicions, but contends a warrant or his consent was required to open the screen door. From this he argues there is no specific exception for a "search incident to a *Terry* stop."

---

[3] Before the district court, Richmond claimed the officers conducted an investigatory stop that was not supported by reasonable suspicion. Reply in Support of Motion to Suppress at 2, 4, United States v. Richmond, No. 16-CR-197 (E.D. Wis. Mar. 13, 2017), ECF No. 23. On appeal, he now describes the officers' entry on the porch as consensual. Brief of Appellant at 7, 16–17, 19.

Even so, the Supreme Court upheld the search in *Terry* (a protective frisk) without determining whether an investigatory stop took place before the search. *See United States v. Mendenhall*, 446 U.S. 544, 552 (1980) (explaining same). We follow *Terry*'s approach. For purposes of our review, it matters not whether a *Terry* stop preceded Milone's search.

Now we turn to Richmond's contention that Milone's search behind the screen door infringed upon established Fourth Amendment principles.

### 1. Terry *and later case law permit limited area searches for weapons.*

The Fourth Amendment guarantees the right of the people to be secure in their houses against "unreasonable" police searches. U.S. CONST. amend IV. Curtilage—the "area immediately surrounding and associated with the home"—is entitled to the same Fourth Amendment protection as the home itself. *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (describing the front porch as the "classic exemplar" of constitutionally protected curtilage).

For protective searches for weapons, the Supreme Court has held that area searches are permissible in limited circumstances: "[O]fficers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*." *Long*, 463 U.S. at 1050 n.14 (concluding officers did not act unreasonably in taking preventive measures to ensure there were no weapons within defendant's immediate grasp before permitting him to reenter his automobile). Area searches are allowed "in the *Terry* context" because "the arrestee, who may not himself be armed,

may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity." *Id*. All the same, the search remains a serious intrusion so it "must 'be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.'" *Jackson*, 300 F.3d at 746 (quoting *Terry*, 392 U.S. at 29); *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (holding a *Terry* search "must be strictly limited to that which is necessary for the discovery of weapons"). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence … ." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

We have similarly held that, under *Terry*, an officer may conduct a protective search for weapons of an individual's person, "and area within his control," if "'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Cady v. Sheahan*, 467 F.3d 1057, 1061–62 (7th Cir. 2006) (quoting *Terry*, 392 U.S. at 27). A protective search for weapons "is a vital tool to serve the 'immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'" *Id*. at 1061 (quoting *Terry*, 392 U.S. at 23).

Richmond points to various decisions involving impermissible searches which he contends mandate reversal. First, he invokes *Florida v. Jardines*, in which the Supreme Court assessed the permissibility of a police search on a front porch. 569 U.S. at 3–5. In that case, officers without a warrant or probable cause walked up to the front door of a residence and

used a drug-sniffing dog to investigate an unverified tip that marijuana was being grown in the home. *Id.* at 3–4. The Court acknowledged an implied license exists for members of the public to approach a home and knock on the front door based upon custom and social norms. *Id.* at 10–11. But the warrant-less use of sensory-extending drug dogs to discover incriminating evidence inside the home exceeds this customary invitation and constitutes a trespassory search implicating the Fourth Amendment. *Id.* at 10–12 (affirming Florida Supreme Court's holding that canine sniff of front door was a search requiring a warrant).

Richmond also cites *Collins v. Virginia*, which questioned whether the automobile search exception justifies an invasion of curtilage. 138 S. Ct. 1663, 1671 (2018). In *Collins*, the officer discovered photographs on social media of a potentially stolen motorcycle parked at the top of the driveway of a house. The officer tracked down the address of the home, drove to it, walked up the driveway to investigate, and pulled a tarp off the motorcycle to search its license plate and vehicle identification numbers, which confirmed that the motorcycle was stolen. *Id.* at 1668. The Court held that the automobile exception—which is based largely upon the ready mobility of the vehicle—"extends no further than the automobile itself[,]" and does not give "an officer the right to enter a home or its curtilage to access a vehicle without a warrant." *Id.* at 1671.

Like the officers in *Jardines* and *Collins*, Boyack and Milone performed a search within the curtilage of the house in which Richmond resided. But there are critical distinctions between the circumstances governing the officers' conduct here and the conduct proscribed by the Supreme Court in those cases. First, and most importantly, no imminent safety threat existed

in either *Jardines* or *Collins*. There, the searches were performed while the suspect was absent and the officers did not articulate any threat of danger during their searches. Neither of the officers in those cases made split-second decisions, nor did they invoke *Terry* (or any of *Terry's* underlying principles) to justify their investigations or searches.

Second, the objects searched for in *Jardines* and *Collins* were drugs and stolen property, not weapons. In *Jardines*, the search implicated the actual interior of the home. Here, unlike *Jardines* and *Collins*, at the moment of the search the officers had no indication Richmond had any Fourth Amendment interest in the home. Third, Milone and Boyack's conduct throughout their investigation remained anchored to the *Terry*-exception's safety justifications. *Cf. Collins*, 138 S. Ct. at 1672 ("[R]ely[ing] on the automobile exception to gain entry into a house or its curtilage for the purpose of conducting a vehicle search would unmoor the exception from its justifications."). That conduct is not unfettered "trawl[ing] for evidence." *Cf. Jardines*, 569 U.S. at 6.

Richmond also cites our decision in *United States v. Leo*, where we rejected officer safety as a justification for a search into a backpack containing a gun. 792 F.3d at 749–51. In that case, officers responded to a 911 call that two men committed a burglary. When the officers arrived, they saw two men walking toward a preschool. The officers stopped the men and handcuffed their hands behind their backs. An officer then took the defendant's backpack, placed it out of the defendant's reach, emptied it, and found a gun. *Id*. at 744–45.

*Leo* does not help Richmond. In *Leo*, we held the backpack search was not supported by reasonable suspicion because the defendant could not get "immediate control" of a gun—

while handcuffed—outside his reach. *Id*. at 750. Here, when Milone opened the screen door, Richmond was unrestrained, the district court found he "could have armed himself quickly," and, unlike the *prima facie* privacy expectations of a person carrying a backpack, it was unknown whether Richmond had any privacy interest in the duplex porch.

Put succinctly, *Jardines*, *Collins*, and *Leo* do not concern protective searches to neutralize the threat of a weapon in a suspect's immediate area of control. *Cf. Long*, 463 U.S. at 1049-50 (neutralizing threat in suspect's car passenger compartment); *Cady*, 467 F.3d at 1062 (neutralizing threat in suspect's briefcase). In contrast, *Long* and *Cady* applied the reasoning in *Terry* and its offspring and upheld the protective searches evaluated in those cases. *See Long*, 463 U.S. at 1050 n.14; *Cady*, 467 F.3d at 1062. We do the same here. *See Terry*, 392 U.S. at 24, 26; *see also Dickerson*, 508 U.S. at 373. In sum, police may conduct an area search strictly limited to that which is necessary for the discovery of weapons if the officer has a reasonable and articulable suspicion that the subject whose suspicious behavior he is investigating at close range may be able to gain access to a weapon to harm the officers or others nearby.

### 2. *Reasonable suspicion is required to conduct a search.*

Like all *Terry* searches, Milone's search must be supported by reasonable suspicion. To assess whether reasonable suspicion existed here, we look again to the totality of circumstances known to Boyack and Milone at the time the search occurred. *United States v. Tinnie*, 629 F.3d 749, 751–52 (7th Cir. 2011). We also balance the need to search against the intrusion which the search entails. *Terry*, 392 U.S. at 21; *see also Maryland*

*v. Buie*, 494 U.S. 325, 335–36 (1990); *Pace*, 898 F.2d at 1229 (upholding *Terry* stop on curtilage).

*Terry* contemplates searches to screen persons who may be "armed and presently dangerous." *Terry*, 392 U.S. at 30. In so determining, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27; *Cady*, 467 F.3d at 1061–62 (holding same). Here, the circumstances prompting the officers' suspicions that Richmond was engaged in criminal activity also roused their suspicions he might be armed and dangerous; indeed, the officers suspected Richmond had placed a gun on the threshold of the front door behind the screen door.

Richmond argues his close proximity to a gun does not, by itself, give rise to a reasonable suspicion he was dangerous. He also contends the officers could not reasonably have been alarmed at any point during the encounter because he maintained a calm and cooperative demeanor, he did not run away from the officers, he stepped away from the door where the gun was located, he did not insist on going into his home but stayed and spoke with officers, and Milone stood between him and the suspected gun, impeding Richmond's access to it.

But Richmond's arguments focus on whether the officers subjectively believed he was dangerous. Reasonable suspicion is measured against the totality of the circumstances, an objective test. *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (explaining an officer's subjective motivation to in-

trude within a home "is irrelevant" under the Fourth Amendment; what matters is whether "the circumstances, viewed *objectively*, justify the action.") (emphasis in original, internal brackets omitted).

In determining whether a suspect is "presently dangerous," "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *Cady*, 467 F.3d at 1061–62 (holding same). "More importantly … the fact-specific inquiry into the existence of reasonable suspicion must be undertaken with due regard to common sense and practicality." *Adamson*, 441 F.3d at 521.

Here, Boyack and Milone faced two obvious risks: Richmond might lunge toward what they suspected was a gun, and unknown duplex occupants might access the gun by opening the front door and picking it up off the threshold. The district court found the officers' testimony credible; specifically, the porch was narrow, Richmond was within the immediate vicinity of a gun, the officers did not know who owned the property, and Richmond was large, muscular, and unrestrained. The officers testified Richmond cooperated at that moment, but they also were concerned he might quickly change his mind, physically overwhelm them, and charge for the gun. And Richmond's cooperation did not eliminate the possibility that someone from inside the house could obtain the weapon to use against them, which they also feared.

That Milone and Boyack testified differently as to Richmond's exact location on the porch does not change our analysis. Milone testified Richmond was within the swing radius of the screen door. Boyack placed Richmond a few steps from

the screen door. If the latter, there could be a fractional delay in Richmond's ability to access the gun and use it against them. Richmond's own evidence about the width of the porch supports this finding, and the district court relied on that evidence to conclude Richmond was one or two strides from the gun.

That the officers could have asked or directed Richmond to step away from the front door for a conversation does not alter our assessment. As an initial matter, police officers are not required to take unnecessary risks in the performance of their duties. *See Terry*, 392 U.S. at 23. Officers must make quick decisions in the field, so we judge from the perspective of a reasonably prudent person in the circumstances before us, not 20/20 hindsight. *See id.* at 27; *Cady*, 467 F.3d at 1061–62. Even if we second-guess, had the officers moved Richmond further away from the gun, anyone in the house would still have had ready access to the firearm.

Milone's on-the-spot response is not rendered unreasonable because Richmond was cooperative in the present moment. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Kentucky v. King*, 563 U.S. 452, 466 (2011) (citations and internal quotations omitted). The entire encounter here lasted no longer than half a minute, which called for "necessarily swift action predicated upon the on-the-spot observations of the officer[s] on the beat." *Long*, 463 U.S. at 1047 n.11. The only information the officers knew during the search was that a suspected gun located between the screen door and front door was accessible

to Richmond and to duplex occupants. Milone's corresponding search lasted no longer than necessary to verify the reasonable suspicion of danger, and that search was limited to the only place where the firearm could be accessed.

Based on the totality of these circumstances, Boyack and Milone were objectively and reasonably concerned with their safety, so the balancing required by *Terry* weighs in favor of Milone's minimally intrusive search in which he found the gun. Opening the screen door thus fell within the bounds of a constitutional search.

### 3. *Deference is owed to reasonable factual inferences.*

"[T]he Supreme Court [in *Ornelas*] deliberately chose a formulation that allows the court of appeals to give deference where that is due, but to reject deference where its independent review suggests it is not due." *United States v. Sholola*, 124 F.3d 803, 822 (7th Cir. 1997) (Wood, C.J., concurring) (citing *Ornelas*, 517 U.S. at 699–700). In either case, our determination "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. To demand more of the district court, or Boyack and Milone, under the circumstances of this case would be an unreasonable demand for certainty where none exists. *See id.* at 124–125.

The facts articulated by Boyack and Milone prompt a reasonable inference that Richmond was illegally carrying a gun. Richmond's activity was also consistent with hiding a gun, which the officers suspected and subsequently confirmed. The officers searched only for a gun and found only a gun. They did not search for a gun until *after* seeing Richmond hide a suspected gun, underscoring the non-speculative and non-

pretextual nature of their search. Nor was the search here unreasonably invasive. Opening the screen door provided no information about the interior of the house, the officers did not search Richmond's person, nor did they search any other areas of the porch or exterior of the duplex. The degree of intrusion on Richmond's privacy was as reasonable and minimal as common sense dictated in that moment based upon what the officers had seen and what they knew.

The officers also acted on a commonsense inference that Richmond did not have a license to carry a concealed weapon. Both officers testified they had encountered individuals who possess firearms legally with a concealed-carry license. But those individuals never acted in the way Richmond did by trying to hide the gun on a door sill. To the officers, the likelihood Richmond had a license to carry a concealed weapon was diminished when he stashed the object resembling a gun on the ground, behind a screen door, where it was accessible to others. This is suspicious (and dangerous) behavior for any lawful gun owner, let alone concealed-carry license holders. *See Adams*, 407 U.S. at 146 (noting a limited search "might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law").

Based upon our independent review of the facts and inferences before us, and giving due weight to the district court's credibility determinations, we see no reason to disturb the court's findings. Milone's search was an objectively reasonable police response to a reasonable suspicion of danger.

### 4. *The principles of* **Terry** *and its later case law supported the officers' search.*

*Terry* legitimated protective searches for weapons under the Fourth Amendment, and the Supreme Court has since emphasized the importance of standards necessary to secure police safety. *Maryland v. Buie*, 494 U.S. 325 (1990) is instructive here, as the Supreme Court applied the principles of *Terry* (upholding stop and frisk of a person) and *Long* (upholding roadside search of automobile passenger compartment) and upheld protective police sweeps incident to arrests: "In *Terry* and *Long* we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." *Buie*, 494 U.S. at 333. Neither *Terry* nor *Long* involved protective sweeps incident to arrest, yet the Supreme Court held that the principles they applied in *Terry* and *Long* applied in *Buie*. *Id* at 333–34.

Each of these cases evaluated the dangerousness of the police confrontations and, as we do here, balanced the interests of officer safety, effective law enforcement, and individual rights. *See id*. ("The ingredients to apply the balance struck in *Terry* and *Long* are present in this case."). We see no difference between the safety concerns which justified the searches in *Buie*, *Terry*, or *Long*, and those articulated by Boyack and Milone. Both officers had an immediate interest in assuring themselves that neither Richmond nor someone inside the duplex could gain immediate control of a gun and use it against them.

This decision would differ if Richmond's gun was located behind the closed front door. A *Terry*-search like this must be

limited to a weapon, in areas where a weapon may be concealed, and only when police have a reasonable and articulable suspicion that a suspect poses a danger from the presence of a weapon within a suspect's immediate access or control.

### III. CONCLUSION

Given the totality of the circumstances, the officers' suspicions were reasonable that Richmond was illegally carrying a gun. Because Richmond (or someone else) had ready access to the gun, officer Milone acted reasonably to extinguish a patent safety threat when he performed a brief search limited exclusively to the area where both officers saw the object, later confirmed to be a gun, was placed.

For these reasons, we AFFIRM.

WOOD, *Chief Judge*, dissenting. The question in this case is whether the police are entitled to enter, search, and seize an object from a person's home (including its curtilage) when they do not have a warrant, they do not have probable cause to believe that a crime is being committed, and none of the exceptions to the warrant requirement such as exigent circumstances is present. The majority concludes that the answer is "yes." It does so by diluting the probable-cause requirement for searches of a home down to the "reasonable-suspicion" level described in *Terry v. Ohio*, 392 U.S. 1 (1968), even though nothing in *Terry* or any other decision of the Supreme Court justifies this step. I respectfully dissent.

**I**

While the majority's description of the facts is mostly accurate—minus a potentially important detail I discuss below—I restate them here in order to stress some additional relevant circumstances. Around 11:40 p.m. on the night of October 11, 2016, Antoine Richmond was walking toward his home. Two Milwaukee police officers—Anthony Milone and Chad Boyack—spotted Richmond about 70 feet away from their marked squad car. They noticed that his hand was tucked in the kangaroo pouch of his shirt, which was bulging out. Boyack said that he had a hunch that the bulge was caused by a gun.

So far, there was nothing that would support a finding that Richmond was doing anything wrong. Like many states in the post-*Heller* world, Wisconsin permits both "concealed carry" and "open carry" of a firearm. See Wis. Stat. § 175.60 (concealed); Wis. Stat. § 947.01 (person not guilty of disorderly conduct for "going armed with a firearm" regardless whether it "is concealed or openly carried"). True, the neighborhood

in which Richmond was walking was known to be a high-crime area, but that simply underscores why a person might, for self-defense, want to have a gun with him. The act of walking down the street with a visible gun or a possible gun under some clothing thus does not, without more, give rise even to a reasonable suspicion that the person is violating the law, much less probable cause. And at this stage of the story, there was nothing more. Richmond had not seen them, nor was he doing anything that could be characterized as flight or unexplained concealment.

With their curiosity piqued by the bulge, the officers made a U-turn and approached Richmond; at that point they briefly made eye contact with him. Richmond then "picked up his pace, left the sidewalk, and crossed the grass in front of a duplex at 1933/35 West Vienna Avenue." *United States v. Richmond*, No. 16-cr-197-pp, at 3 (E.D. Wis. May 18, 2018). This was still not enough to raise even a reasonable suspicion that Richmond was committing even a minor crime. He was not running away from the squad car, *cf. Illinois v. Wardlow*, 528 U.S. 119 (2000), and no one has pointed to any Milwaukee or Wisconsin rule requiring people to walk only on the sidewalk. Moreover, as I explain in more detail below, the majority's statement that Richmond "changed direction" upon seeing the officers goes beyond the findings of either the magistrate judge or the district judge; it is at best the government's version of the events.

As the officers parked their squad car and got out, Richmond walked up the steps to the porch, opened the screen door, and put a dark object on the door-frame between the screen door and the principal front door, which was closed. The officers could not identify the object that Richmond had

put down, even though they suspected that it might be a gun. Richmond closed the screen door and headed down the stairs toward the officers. Officer Milone walked around him toward the door, while Officer Boyack identified the two as Milwaukee police. Milone then opened the screen door, saw a black, semi-automatic handgun, and seized it. Boyack asked Richmond if he was a felon, and Richmond admitted that he was. The officers promptly arrested Richmond and placed him into custody. Ultimately, he was convicted on a federal charge of illegal possession of a gun as an ex-felon, 18 U.S.C. § 922(g), upon a conditional plea of guilty. Everyone agrees that the only issue in the case is whether Richmond's motion to suppress the gun should have been granted.

## II

There are only two ways in which one might seek to justify the officers' act of opening the screen door and seizing the gun: first, Richmond might have consented to their entry; or second, the police might have had the right to enter without consent, either because they had a warrant, or because one of the exceptions to the warrant requirement applies. No one argues that Richmond consented to Milone's act of opening his screen door. I accept, however, and Richmond concedes, that the *conversation* that took place on the porch *before* Milone opened the door was consensual.

That takes me directly to the Fourth Amendment analysis of the officers' actions. I first explain why they violated the rule of *Florida v. Jardines*, 569 U.S. 1 (2013), and I then discuss why the *Terry* rule cannot save this search and seizure.

A

In *Jardines*, the Supreme Court considered the question "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." *Id.* at 3. There, the police officer had allowed the dog to go up to the base of the front door of the house; the dog alerted to the presence of drugs (in that case, marijuana); and the detective then obtained a warrant to search the house based on the dog's alert.

The Court began its analysis by emphasizing that the Fourth Amendment has always protected against physical intrusions of the home. *Id.* at 5. It then summarized its holding as follows:

> That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id.* at 5–6. The home, the Court continued, "is first among equals" for purposes of the Fourth Amendment. *Id.* at 6. And that does not mean only the physical structure of the building. The Court went out of its way to reaffirm that the curtilage— that is, "the area immediately surrounding and associated with the home"—is also part of the home itself under the Fourth Amendment. *Id.* (cleaned up). The front porch, it concluded, is "the classic exemplar" of a space that falls within the curtilage. *Id.* at 7.

The Court then rejected the possibility that the dog's presence on the porch fell within the license that the home's occupants are presumed to grant for "solicitors, hawkers, and peddlers of all kinds," *id.* at 8, with this comment:

> [I]ntroducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that.*

*Id.* at 9. If an officer's actions fall outside the scope of the license that a reasonable officer can presume—if, in other words, the officer takes actions beyond those that a homeowner has authorized for all visitors—*Jardines* holds that it is immaterial that the officer might be lawfully *present* while conducting those unauthorized actions. And although the subjective intent of the officer is irrelevant to the legality of his actions, see, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011), *Jardines* explained that this means only that "a stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." 569 U.S. at 10.

The Court returned to this theme in *Collins v. Virginia*, 138 S. Ct. 1663 (2018), in which it considered "whether the automobile exception to the Fourth Amendment permits a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein." *Id.* at 1668. No, was the Court's clear answer. In that case, the police believed that a motorcycle parked in defendant Collins's driveway was stolen. One officer went to the house, walked up the driveway to the motorcycle, lifted up a tarp that was covering it, recorded the identifying information, and confirmed that it was indeed stolen.

In light of *Jardines*, there was no way in which that search could be justified as a warrantless search of the home or its curtilage. Instead, the state tried to shoehorn the search into the so-called automobile exception to the warrant requirement—an exception that developed because of the inherent mobility of the vehicle. The Court rejected that effort, explaining that "the scope of the automobile exception extends no further than the automobile itself. … Nothing in our case law, however, suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle without a warrant." *Id.* at 1671. It also reconfirmed, in words that this panel should be respecting, that it "already has declined to expand the scope of other exceptions to the warrant requirement to permit warrantless entry into the home." *Id.* at 1672. It went on to list examples of its commitment to the warrant requirement, including the plain-view doctrine, which requires that "the officer have a lawful right of access to the object itself," *id.*, and, "absent another exception such as exigent circumstances, officers may not enter a home to make an arrest without a warrant, *even when they have probable cause.*" *Id.* (emphasis added).

Here, the majority accepts that the officers lacked probable cause to search the home (or, importantly, its curtilage). Given that deficit, and the uncontested fact that none of the exceptions to the warrant requirement applies here, Officer Milone's act of opening the screen door and looking behind it—which easily qualifies as an intrusion into at least the curtilage, and probably also the home—was forbidden. That act cannot be saved by the implicit license to approach the door, any more than that license saved the dog-sniff in *Jardines*. The majority observes that "Boyack and Milone were permitted to enter onto the porch without his consent" and that "he

consented to the officers' presence on the porch." *Ante* at 9 n.2. Fine, but unhelpful. The critical fact is that the officers did more than they were invited or implicitly permitted to do when they opened and looked behind the screen door: there was no "invitation to do *that*." *Jardines*, 569 U.S. at 9. Likewise, it would make no difference if (counterfactually) "Boyack and Milone had articulated objectively reasonable grounds [that is, something grounded in ascertainable facts] to suspect Richmond was engaged in criminal activity that justified their *entry onto the porch*." *Ante* at 10 (emphasis added). They did not need reasonable suspicion to walk up to the porch and talk with Richmond. But they needed *more* than reasonable suspicion to open the door and thereby conduct a search of the home's curtilage. And that they lacked.

The majority also asserts that "at the moment of the search the officers had no indication Richmond had any Fourth Amendment interest in the home." *Ante* at 15. Putting aside the fact that the government never argued this issue, the officers' subjective belief about Richmond's own connection to the property (or lack thereof) is entirely irrelevant to the legality of the search or to the availability of the suppression remedy. If it had been another person's home, the government would have so argued, and Richmond would not have been able to demonstrate the necessary interest for a Fourth Amendment claim. Since it was Richmond's home, the government reasonably refrained from any such challenge, thereby forfeiting any argument it might have made. Had the government snooped behind the screen door of another person's house without a warrant or other legal basis for its action, we might right now be facing a case in which that other person's Fourth Amendment rights were violated.

For purposes of the suppression remedy, the operative in-
quiry is whether the person seeking suppression *in fact* pos-
sesses enough of a connection to the home to trigger the pro-
tections of the Fourth Amendment. If the search of the curti-
lage had turned up something belonging to another resident
of the home, such as illegal drugs or child pornography, that
other resident would be entitled to contest that search and
seek to suppress the evidence. That would be so even though
the police had never given any thought to the possibility of
another resident or her connection to the property. Here,
Richmond does have a Fourth Amendment interest in the
home, giving him the necessary interest to contest the search
and the right to seek suppression of illegally collected evi-
dence. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

The government might point to *United States v. Santana*,
427 U.S. 38 (1976), as support for its position, but nothing in
that case is in tension with the later decisions in *Jardines* and
*Collins*. The only common element is the fact that a person's
front porch featured in the facts. Otherwise, everything that
is missing here was present there. First, the district court
found, and the Supreme Court confirmed, that the police had
"strong probable cause" that defendant Santana had just par-
ticipated in an illegal sale of narcotics. *Id.* at 41–42. Second, it
found that Santana herself was in a public place as she stood
on the threshold of her dwelling, and so, given the existence
of probable cause, the police were entitled to arrest her there
under the authority of *United States v. Watson*, 423 U.S. 411
(1976). Finally, even though she briefly retreated into the
house, the Court held that the police were entitled to follow
her, because the requirements for "hot pursuit" were satis-
fied. *Santana,* 417 U.S. at 42–43. In Richmond's case, there was

neither probable cause nor hot pursuit—the two crucial features supporting the result in *Santana*.

I conclude, therefore, that a straightforward application of *Jardines* and *Collins* requires us here to find that the police violated the Fourth Amendment when they opened the screen door, thereby entering and searching the curtilage of Richmond's home in a manner that exceeded the boundaries of any express or implied license. That violation continued when they seized the gun. Because neither a warrant nor probable cause (nor any other exception) protected that entry and seizure, the gun should have been suppressed.

B

Interestingly, my colleagues recognize that there was no probable cause for the search, and that it was the search of a home. In order to salvage Richmond's conviction, they resort to the *Terry* line of cases to justify their decision. As I now explain, however, they have stretched *Terry* beyond anything the Supreme Court has ever endorsed.

The first question for *Terry* purposes is when, if ever, did the police develop a reasonable suspicion that Richmond was violating the law? We can rule out several points. First, as I indicated earlier, at the moment when Richmond was walking along the street in a high-crime neighborhood with a bulge in his front pocket, the police had no support for a reasonable suspicion of any misconduct. Plenty of people are out and about around midnight, after spending an evening with friends, seeing a movie or live show, or working a late shift. Unfortunately, plenty of people also live in neighborhoods with a significant crime problem. They are not confined to quarters, however, and so they are just as entitled to walk

around in the evening as anyone else. But, the majority stresses, Richmond had a bulge in his pocket, and the officers, based on their experience, believed that this bulge was a gun. That was, however, at most a guess. It could just as easily have been a couple of beer cans, or a late-night snack, or a book. Reasonable suspicion requires more than educated speculation. And critically, as of that time Richmond had done nothing that a person with a valid firearms license might also have done.

The next suspicious event to which the majority points is the fact that Richmond accelerated his pace when he realized that the police were interested in him. But nothing in the record supports a finding that he turned tail and ran, as was the case in *Wardlow*. In fact, Officer Boyack acknowledged that Richmond "was not running or sprinting." The majority adopts the government's assertion that Richmond "changed direction" upon seeing the officers, *ante* at 2, but that purported fact appears nowhere in the district court's opinion nor in the magistrate judge's report and recommendation. It is therefore improper for this court to assume that the officers had an objective basis to suspect a violation of the law because they saw Richmond make an "unusual change of course," *id.*, at least without making clear that we are finding facts for the first time. Yet the majority bases its finding of reasonable suspicion at least partly on this fact. *Ante* at 8.

Even if we were entitled to consider whether Richmond changed direction, the record support for that proposition is quite weak. There is testimony from one of the officers indicating that Richmond "did change his direction," but the officer elaborated as follows: "First he was walking north. He then went on a – not a hard right but it would be to his right

on an angle across the grass which would be to his east." Dkt. 75 at 9-10. It is doubtful whether a person's choice to cut across the grass to reach a home located along his preexisting route—as many people might do at the conclusion of a walk— is best described as a "change of direction." That seems more like a phrase that signals at least a 90 degree turn, if not a 180. It is hardly an "unusual change of course," *ante* at 2, for pedestrians to take this type of shortcut.

A person who keeps on going in the general direction in which he was traveling but accelerates his pace upon making eye contact with a police officer—which is the most that this record establishes—has not done enough to give rise to reasonable suspicion. It is not hard to imagine that this person might want to avoid a late-night chat with the police, especially given the notoriously fraught state of community-police relationships in many cities. Gallup reported a few years ago that confidence in the police is at its lowest level in 22 years. See Jeffrey M. Jones, "In U.S., Confidence in Police Lowest in 22 Years," Gallup News, at https://news.gallup.com/poll/183704/confidence-police-lowest-years.aspx. A chart in that article shows that this problem is especially severe among African-Americans, only 30% of whom reported in 2014–15 that they had either "a great deal" or "quite a lot" of confidence in the police.

This leaves Richmond's act of placing the object behind the screen door when he reached the porch. That one act does not suffice to support reasonable suspicion, in my view, even taking into account the fact that a person with a valid firearm license presumably would not mind being found with the weapon. As of this time, the police had nothing but a "hunch" that the item was a gun, rather than a package that Richmond

wanted to tuck away before his encounter. (If this were a drug
case, would the police have insisted that they suspected that
Richmond was carrying a brick of cocaine?) A person in a
high-crime neighborhood is very likely aware that the police
have been known to make mistakes about objects, with tragic
results. The act of stashing the unknown package thus does
not salvage an otherwise inadequate case for reasonable sus-
picion. I will not dignify with any response the government's
effort to squeeze reasonable suspicion out of the fact that
Richmond was "a large, muscular man who stood unre-
strained within a couple strides from where he concealed"
what hindsight proved to be a gun. The majority lists this fact
as evidence substantiating the officers' concern for their
safety. Does this mean that large, physically fit men can be
searched at will, in the name of officer safety? I hope not. Yet
the government cites Richmond's appearance as one of "at
least five articulable facts [that] support[ed] their suspicion." It
does not.

And even if this thin set of facts were enough to justify a
working assumption that Richmond had a gun, so what? Gen-
erally speaking, to justify an investigatory stop, the police
must have "a particularized and objective basis for suspecting
the particular person stopped of criminal activity." *Navarette
v. California*, 572 U.S. 393, 396 (2014), citing *United States v. Cor-
tez*, 449 U.S. 411, 417–18 (1981). Mere possession of a firearm
in a high-crime area—assuming for a moment that the police
had an adequate basis for even this conclusion—is not good
enough. See *United States v. Watson*, 900 F.3d 892, 896–97 (7th
Cir. 2018). As we pointed out in *Watson*, "[p]eople who live in
rough neighborhoods may want and, in many situations, may
carry guns for protection. They should not be subject to more

intrusive police practices than are those from wealthy neigh-
borhoods." *Id.* at 897.

The police did not have the necessary reasonable suspi-
cion to frisk Richmond, had they accosted him before he
reached his front door, and they made no effort to do so. Even
if they did, they knew that he was no longer carrying the mys-
tery package; for officer safety, they could have escorted him
to the squad car, far from the package, and gone about their
business. I am aware of no authority that endorses the con-
duct of a *Terry*-like "frisk" not of a person, but of a home or
its curtilage. Any kind of search of the home or curtilage on
less than probable cause (supported by a warrant, normally),
or without one of the recognized exceptions such as hot pur-
suit, is forbidden by binding Supreme Court precedent, nota-
bly *Jardines* and *Collins*.

I would therefore reverse the district court's decision to
deny Richmond's motion to suppress and return this case to
that court for further proceedings. I thus dissent from the ma-
jority's decision.